# Matter of M-E-V-G-, Respondent

*Decided February 7, 2014*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)   In order to clarify that the "social visibility" element required to establish a cognizable "particular social group" does not mean literal or "ocular" visibility, that element is renamed as "social distinction." *Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008); *Matter of S-E-G-*, 24 I&N Dec. 579 (BIA 2008); *Matter of A-M-E- &J-G-U-*, 24 I&N Dec. 69 (BIA 2007); and *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006), clarified.

(2)   An applicant for asylum or withholding of removal seeking relief based on "membership in a particular social group" must establish that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question.

(3)   Whether a social group is recognized for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor.

FOR RESPONDENT:  Martin Duffy, Esquire; Ayodele Gansallo, Esquire, Philadelphia, Pennsylvania

FOR THE DEPARTMENT OF HOMELAND SECURITY:  George R. Martin, Associate Legal Advisor

AMICI CURIAE:   American Immigration Lawyers Association;[1] National Immigrant Justice Center;[2] United Nations High Commissioner for Refugees[3] and Williams & Connolly, LLP;[4] William S. Boyd School of Law, University of Nevada, Las Vegas[5]

BEFORE:  Board Panel:  ADKINS-BLANCH, Vice Chairman; GUENDELSBERGER and GREER, Board Members.

GUENDELSBERGER, Board Member:

This case is before us on remand from the United States Court of Appeals for the Third Circuit for further consideration of the respondent's applications for asylum and withholding of removal.  The court declined to

[1]  Benjamin R. Casper, Esquire; Vikram K. Badrinath,  Esquire
[2]  Charles Roth, Esquire; Ashley Huebner, Esquire; Lisa Koop, Esquire
[3]  Pamela Goldberg, Esquire
[4]  Ana C. Reyes, Esquire; Amy Mason Saharia, Esquire
[5]  Fatma E. Marouf, Esquire

afford deference to our conclusion that a grant of asylum or withholding of removal under the "particular social group" ground of persecution requires the applicant to establish the elements of "particularity" and "social visibility." Upon further consideration of the record and the arguments presented by the parties and amici curiae, we will clarify our interpretation of the phrase "particular social group." [6] We adhere to our prior interpretations of the phrase but emphasize that literal or "ocular" visibility is not required, and we rename the "social visibility" element as "social distinction." The record will be remanded to the Immigration Judge for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

Prior decisions of the Board and Third Circuit have set forth the underlying facts of this case in detail. In short, the respondent claims that he suffered past persecution and has a well-founded fear of future persecution in his native Honduras because members of the Mara Salvatrucha gang beat him, kidnaped and assaulted him and his family while they were traveling in Guatemala, and threatened to kill him if he did not join the gang. In addition, the respondent testified that the gang members would shoot at him and throw rocks and spears at him about two to three times per week. The respondent asserts that he was persecuted "on account of his membership in a particular social group, namely Honduran youth who have been actively recruited by gangs but who have refused to join because they oppose the gangs."

The Immigration Judge issued a decision on June 15, 2005, denying the respondent's applications for asylum, withholding of removal, and protection under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, 198, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). We summarily affirmed the Immigration Judge on February 27, 2006. On September 7, 2007, the Third Circuit granted the respondent's petition for review and remanded the case for further consideration of his arguments regarding his membership in a particular social group.

---

[6]  On remand, both parties and amici curiae filed additional briefs, which we acknowledge and appreciate. On December 11, 2012, a three-member panel of the Board heard oral arguments from both parties and the United Nations High Commissioner for Refugees ("UNHCR").

*Valdiviezo-Galdamez v. Att'y Gen. of U.S.* ("*Valdiviezo-Galdamez I*"), 502 F.3d 285 (3d Cir. 2007).

On remand, we issued a decision on October 22, 2008, which again denied the respondent's applications for asylum and withholding of removal. We held that the respondent did not establish past persecution "on account of a protected ground" and applied our intervening decisions in *Matter of S-E-G-*, 24 I&N Dec. 579 (BIA 2008), and *Matter of E-A-G-*, 24 I&N Dec. 591 (BIA 2008), in concluding that the respondent did not show that his proposed particular social group possessed the required elements of "particularity" and "social visibility."

The case is now before us following a second remand from the Third Circuit. *Valdiviezo-Galdamez v. Att'y Gen. of U.S.* ("*Valdiviezo-Galdamez II*"), 663 F.3d 582 (3d Cir. 2011). The court found that our requirement that a particular social group must possess the elements of "particularity" and "social visibility" is inconsistent with prior Board decisions, that we have not announced a "principled reason" for our adoption of that inconsistent requirement, and that our interpretation is not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Valdiviezo-Galdamez II*, 663 F.3d at 608. Nevertheless, the court advised that "an agency can change or adopt its policies" and recognized that the Board may add new requirements to, or even change, its definition of a "particular social group." *Id.* (quoting *Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002)) (internal quotation marks omitted).

## II. ISSUE

The question before us is whether the respondent qualifies as a "refugee" as a result of his past mistreatment, and his fear of future persecution, at the hands of gangs in Honduras. Specifically, we address whether the respondent has established an asylum claim based on his membership in a particular social group.

## III. PARTICULAR SOCIAL GROUP

### A. Origins

An applicant for asylum has the burden of establishing that he or she is a refugee within the meaning of section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2012). This requires the applicant to demonstrate that he or she suffered past persecution or has a well-founded fear of future persecution on account of "race, religion,

nationality, membership in a particular social group, or political opinion." *Id.*; *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987) (recognizing that one of Congress' primary purposes in passing the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, was to implement the principles agreed to in the United Nations Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968) ("Protocol"), as well as the United Nations Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954), *available at* http://www.unhcr.org/3b66c2aa10.html ("Convention")).

The phrase "membership in a particular social group," which is not defined in the Act, the Convention, or the Protocol, is ambiguous and difficult to define. *Matter of Acosta*, 19 I&N Dec. 211, 232–33 (BIA 1985); *see also, e.g.*, *Valdiviezo-Galdamez II*, 663 F.3d at 594 ("The concept is even more elusive because there is no clear evidence of legislative intent."); *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993) ("Read in its broadest literal sense, the phrase is almost completely open-ended. Virtually any set including more than one person could be described as a 'particular social group.'").

Congress has assigned the Attorney General the primary responsibility of construing ambiguous provisions in the immigration laws, and this responsibility has been delegated to the Board. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999); *see also* section 103(a)(1) of the Act, 8 U.S.C. § 1103(a)(1) (2012) (providing that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling"). The Board's reasonable construction of an ambiguous term in the Act, such as "membership in a particular social group," is entitled to deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 844.

We first interpreted the phrase "membership in a particular social group" in *Matter of Acosta*. We found the doctrine of "ejusdem generis" helpful in defining the phrase, which we held should be interpreted on the same order as the other grounds of persecution in the Act. *Matter of Acosta*, 19 I&N Dec. at 233–34. *See generally CSX Transp., Inc. v. Alabama Dep't of Revenue*, 131 S. Ct. 1101, 1113 (2011) (stating that the canon "ejusdem generis" literally means "of the same kind"). The phrase "persecution on account of membership in a particular social group" was interpreted to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable

characteristic." *Matter of Acosta*, 19 I&N Dec. at 233. The common characteristic that defines the group must be one "that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.*

### B. Evolution of the Board's Analysis of Social Group Claims

*Matter of Acosta* was decided based on whether a common immutable characteristic existed. *Matter of Acosta*, 19 I&N Dec. at 233. We rejected the applicant's claim that a Salvadoran cooperative organization of taxi drivers was a particular social group, because members could change jobs and working in their job of choice was not a "fundamental" characteristic. *Id.* at 234 ("[T]he internationally accepted concept of a refugee simply does not guarantee an individual a right to work in the job of his choice."). Because there was no common immutable characteristic in *Matter of Acosta*, we did not reach the question whether there should be additional requirements on group composition.

At the time we issued *Matter of Acosta*, only 5 years after enactment of the Refugee Act of 1980, relatively few particular social group claims had been presented to the Board. Given the ambiguity and the potential breadth of the phrase "particular social group," we favored a case-by-case determination of the particular kind of group characteristics that would qualify under the Act. *Id.* at 233. This flexible approach enabled courts to apply the particular social group definition within a wide array of fact-specific asylum claims.

Now, close to three decades after *Acosta*, claims based on social group membership are numerous and varied. The generality permitted by the *Acosta* standard provided flexibility in the adjudication of asylum claims. However, it also led to confusion and a lack of consistency as adjudicators struggled with various possible social groups, some of which appeared to be created exclusively for asylum purposes. *See, e.g.*, *Sepulveda v. Gonzales*, 464 F.3d 770, 772 (7th Cir. 2006) ("A social group has to have sufficient homogeneity to be a plausible target for persecution. But under *Acosta* this is not a demanding requirement . . . ."). In *Matter of R-A-*, 22 I&N Dec. 906, 919 (BIA 1999; A.G. 2001), we cautioned that "the social group concept would virtually swallow the entire refugee definition if common characteristics, coupled with a meaningful level of harm, were all that need be shown."[7]

---

[7] Although our decision in *Matter of R-A-* was vacated by the Attorney General in 2001 and was explicitly limited to the facts of that case, its role in the progression of particular social group claims analysis remains relevant.

Over the years there were calls for the Board to state with more clarity its framework for analyzing social group claims. *E.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc); *Rojas-Perez v.Holder*, 699 F.3d 74, 81 (1st Cir. 2012); *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1575 n.6 (9th Cir. 1986) (noting that there is "a dearth of judicial authority construing the meaning of 'particular social group'"). To provide clarification and address the evolving nature of the claims presented by asylum applicants, we refined the particular social group interpretation first discussed in *Matter of Acosta* to provide the additional analysis required once an applicant demonstrated membership based on a common immutable characteristic.

In a series of cases, we applied the concepts of "social visibility" and "particularity" as important considerations in the particular social group analysis, and we ultimately deemed them to be requirements. *See Orellana-Monson v. Holder*, 685 F.3d 511, 521 (5th Cir. 2012) ("[C]ase by case adjudication is permissible and . . . such adjudication does not necessarily follow a straight path. The BIA may make adjustments to its definition of 'particular social group' and often does so in response to the changing claims of applicants."). Although we expanded the particular social group analysis beyond the *Acosta* test, the common immutable characteristic requirement set forth there has been, and continues to be, an essential component of the analysis.

In *Matter of C-A-*, we recognized "particularity" as a requirement in the particular social group analysis and held that the "social visibility" of the members of a claimed social group is "an important element in identifying the existence of a particular social group." *Matter of C-A-*, 23 I&N Dec. 951, 957, 959–61 (BIA 2006) (holding that "noncriminal informants working against the Cali drug cartel" in Colombia were not a particular social group), *aff'd sub nom. Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), *cert. denied*, 549 U.S. 1115 (2007). We subsequently determined that a "particular social group" cannot be defined exclusively by the claimed persecution, that it must be "recognizable" as a discrete group by others in the society, and that it must have well-defined boundaries. *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74–76 (BIA 2007) (holding that "wealthy" Guatemalans were not shown to be a particular social group within the meaning of the "refugee" description), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007).

Finally, in 2008, we issued *Matter of S-E-G-* and *Matter of E-A-G-*, in which we held that—in addition to the common immutable characteristic requirement set forth in *Acosta*—the previously introduced concepts of "particularity" and "social visibility" were distinct requirements for the "membership in a particular social group" ground of persecution. In

*Matter of S-E-G-*, 24 I&N Dec. at 582, we stated that we were seeking to provide "greater specificity to the definition of a social group" outlined in *Acosta* by requiring an applicant to establish "particularity" and "social visibility," consistent with our prior decisions. In *Matter of E-A-G-*, we noted that "we have issued a line of cases reaffirming the particular social group formula set forth in *Matter of Acosta* . . . and providing further clarification regarding its proper application." *Matter of E-A-G-*, 24 I&N Dec. at 594 (reaffirming the requirements of *Acosta* and the additional requirements of "particularity" and "social visibility").

Our articulation of these requirements has been met with approval in the clear majority of the Federal courts of appeals. *See Umana-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013); *Henriquez-Rivas v. Holder*, 707 F.3d at 1087–91 (clarifying the criteria while reserving assessment of their validity); *Orellana-Monson v. Holder*, 685 F.3d at 521; *Gaitan v. Holder*, 671 F.3d 678, 681 (8th Cir. 2012); *Zelaya v. Holder*, 668 F.3d 159, 165–66 & n.4 (4th Cir. 2012) (deferring to our particularity requirement); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 649–53 (10th Cir. 2012); *Scatambuli v. Holder*, 558 F.3d 53, 59–61 (1st Cir. 2009); *Ucelo-Gomez v. Mukasey*, 509 F.3d at 74; *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d at 1196–99. However, it has not been universally accepted. *See Valdiviezo-Galdamez II*, 663 F.3d at 603–09; *Gatimi v. Holder*, 578 F.3d 611, 615–16 (7th Cir. 2009) (rejecting the social visibility requirement); *see also Cece v. Holder*, 733 F.3d 662, 668–69 & n.1 (7th Cir. 2013) (en banc).

## C. Positions of the Parties

On appeal, the respondent and amici curiae argue that the Board should disavow the requirements of "social visibility" and "particularity" and should restore *Matter of Acosta* as the sole standard for determining a particular social group.[8] The Department of Homeland Security ("DHS") argues that "social visibility" and "particularity" are valid refinements to the particular social group interpretation but that the two concepts should be clarified and streamlined into a single requirement.

---

[8] The UNHCR argues that if the Board does not return to solely utilizing *Matter of Acosta*, we should adopt its alternative approach, in which a particular social group may be established by the "protected characteristics" approach embodied in *Matter of Acosta* or the "social perception" approach that was established in Australia. *See A v Minister for Immigration and Ethnic Affairs* (1997) 190 CLR 225 (Austl.), *available at* http://www.refworld.org/docid/3ae6b7180.html.

## IV.  ANALYSIS

We take this opportunity to clarify our interpretation of the phrase "membership in a particular social group."  In doing so, we adhere to the social group requirements announced in *Matter of S-E-G-* and *Matter of E-A-G-*, as further explained here and in *Matter of W-G-R-*, 26 I&N Dec. 208 (BIA 2014), a decision published as a companion to this case.[9]  We believe that these requirements provide guidance to courts and those seeking asylum based on "membership in a particular social group," are necessary to address the evolving nature of claims asserted on this ground of persecution, and are essential to ensuring the consistent nationwide adjudication of asylum claims.  *See Matter of R-A-*, 24 I&N Dec. 629, 631 (A.G. 2008) ("Providing a consistent, authoritative, nationwide interpretation of ambiguous provisions of the immigration laws is one of the key duties of the Board."); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); 8 C.F.R. § 1003.1(d)(1) (2013).  In this regard, we clarify that the "social visibility" test was never intended to, and does not require, literal or "ocular" visibility.

### A. Protection Within the Refugee Context

The interpretation of the phrase "membership in a particular social group" does not occur in a contextual vacuum.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484–85 (1996) (stating that although analysis of a statute begins with its text, interpretation of the statutory language does not occur in a contextual vacuum).  Consistent with the interpretive canon "ejusdem generis," the proper interpretation of the phrase can only be achieved when it is compared with the other enumerated grounds of persecution (race, religion, nationality, and political opinion), and when it is considered within the overall framework of refugee protection.[10]

The Act and the Protocol do not extend protection to all individuals who are victims of persecution. They identify "refugees" as only those who face persecution on account of "race, religion, nationality, membership in a

---

[9]  The Supreme Court has stated that administrative agencies may adopt a new or changed interpretation as long as it is based on a "reasoned explanation."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  Our decision in this case is not a new interpretation, but it further explains the importance of particularity and social distinction as part of the statutory definition of the phrase "particular social group."

[10]  Ejusdem generis is a more specific application of the canon "noscitur a sociis," meaning that "a word is known by the company it keeps."  *New Castle County DE v. Nat'l Union Fire Ins. Co. of Pittsburg*, 243 F.3d 744, 751 n.4 (3d Cir. 2001) (stating that "*noscitur a sociis* is simply a broad form of *ejusdem generis*").

particular social group, or political opinion." Section 101(a)(42) of the Act; Protocol, *supra*, art. 1.

The limited nature of the protection offered by refugee law is highlighted by the fact that it does not cover those fleeing from natural or economic disaster, civil strife, or war. *See Matter of Sosa Ventura*, 25 I&N Dec. 391, 394 (BIA 2010) (explaining that Congress created the alternative relief of Temporary Protected Status because individuals fleeing from life-threatening natural disasters or a generalized state of violence within a country are not entitled to asylum). Similarly, asylum and refugee laws do not protect people from general conditions of strife, such as crime and other societal afflictions. *See Konan v. Att'y Gen. of U.S.*, 432 F.3d 497, 506 (3d Cir. 2005); *Abdille v. Ashcroft*, 242 F.3d 477, 494 (3d Cir. 2001) ("[O]rdinary criminal activity does not rise to the level of persecution necessary to establish eligibility for asylum."); *Singh v. INS*, 134 F.3d 962, 967 (3d Cir. 1998) ("Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum . . . .") .

Unless an applicant has been targeted on a protected basis, he or she cannot establish a claim for asylum. *See Al Fara v. Gonzales*, 404 F.3d 733, 740 (3d Cir. 2005) ("'[G]enerally harsh conditions shared by many other persons do not amount to persecution.' . . . [H]arm resulting from country-wide civil strife is not persecution 'on account of' an enumerated statutory factor." (quoting *Fatin v. INS*, 12 F.3d at 1240)); *Matter of N-M-A-*, 22 I&N Dec. 312, 323, 326 (BIA 1998) (finding that an applicant who faced "a variety of dangers arising from the internal strife in Afghanistan" did not qualify for asylum).

The "membership in a particular social group" ground of persecution was not initially included in the refugee definition proposed by the committee that drafted the U.N. Convention; it was added later without discussion. *Matter of Acosta*, 19 I&N Dec. at 232. The guidelines to the Protocol issued by the United Nations High Commissioner for Refugees ("UNHCR ") clearly state that the particular social group category was not meant to be "a 'catch all' that applies to all persons fearing persecution." UNHCR, Guidelines on International Protection: "Membership of a Particular Social Group" Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees, at 2, U.N. Doc. HCR/GIP/02/02 (May 7, 2002), *available at* http://www.unhcr.org/3d58de2da.html ("UNHCR Guidelines").

Societies use a variety of means to distinguish individuals based on race, religion, nationality, and political opinion. The distinctions may be

based on characteristics that are overt and visible to the naked eye or on those that are subtle and only discernible by people familiar with the particular culture. The characteristics are sometimes not literally visible. Some distinctions are based on beliefs and characteristics that are largely internal, such as religious or political beliefs. Individuals with certain religious or political beliefs may only be treated differently within society if their beliefs were made known or acted upon by the individual. The members of these factions generally understand their own affiliation with the grouping, and other people in the particular society understand that such a distinct group exists.

Therefore these enumerated grounds of persecution have more in common than simply describing persecution aimed at an immutable characteristic. They have an external perception component within a given society, which need not involve literal or "ocular" visibility. Considering the refugee context in which they arise, we find that the enumerated grounds all describe persecution aimed at an immutable characteristic that separates various factions within a particular society.

## B. Particular Social Group

Given the suggestions that further explanation of our interpretation of the phrase "particular social group" is warranted, we now provide such clarification based on the analysis set forth above. *See, e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d at 1087–89; *Rojas-Perez v. Holder*, 699 F.3d at 81; *Valdiviezo-Galdamez II*, 663 F.3d at 603–09.

The primary source of disagreement with, or confusion about, our prior interpretation of the term "particular social group" relates to the social visibility requirement. *See Umana-Ramos v. Holder*, 724 F.3d at 672–73; *Henriquez-Rivas v. Holder*, 707 F.3d at 1087; *Valdiviezo-Galdamez II*, 663 F.3d at 603–09. Contrary to our intent, the term "social visibility" has led some to believe that literal, that is, "ocular" or "on-sight," visibility is required to make a particular social group cognizable under the Act. *See Valdiviezo-Galdamez II*, 663 F.3d at 606–07. Because of that misconception, we now rename the "social visibility" requirement as "social distinction." [11] This new name more accurately describes the function of the requirement.

---

[11] The term "social distinction" was proposed by the DHS on appeal. It argued for the combination of the "social visibility" and "particularity" requirements into a single "social distinction" requirement because of the close relationship between the two concepts. While we acknowledge that there is some degree of overlap, combining the requirements is not warranted because they serve distinct purposes. Thus, while we

(continued . . .)

Thus, we clarify that an applicant for asylum or withholding of removal seeking relief based on "membership in a particular social group" must establish that the group is

> (1) composed of members who share a common immutable characteristic,
> (2) defined with particularity, and
> (3) socially distinct within the society in question.

### 1.  Overview of Criteria

The criteria of particularity and social distinction are consistent with both the language of the Act and our earlier precedents.  By defining these concepts in *Matter of C-A-* and the cases that followed it, we did not depart from or abrogate the definition of a particular social group that was set forth in *Matter of Acosta*; nor did we adopt a new approach to defining particular social groups under the Act.  *See Henriquez-Rivas v. Holder*, 707 F.3d at 1084 (describing our refinement of the definition of a particular social group).  Instead, we clarified the definition of the term to give it more "concrete meaning through a process of case-by-case adjudication." *INS v. Aguirre-Aguirre*, 526 U.S. at 425 (quoting *INS v. Cardoza Fonseca*, 480 U.S. at 448) (internal quotation marks omitted); *see also Orellana-Monson v. Holder*, 685 F.3d at 521 ("[T]he BIA's current particularity and social visibility test is not a radical departure from prior interpretation, but rather a subtle shift that evolved out of the BIA's prior decisions on similar cases and is a reasoned interpretation, which is therefore entitled to deference."); *Mendez-Barrera v. Holder*, 602 F.3d 21, 26 (1st Cir. 2010); *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d at 1197.

Our interpretation of the phrase "membership in a particular social group" incorporates the common immutable characteristic standard set forth in *Matter of Acosta*, 19 I&N Dec. at 233, because members of a particular social group would suffer significant harm if asked to give up their group affiliation, either because it would be virtually impossible to do so or because the basis of affiliation is fundamental to the members'

_____

adopt the term "social distinction," our use of the term differs from that proposed by the DHS on appeal and at oral argument.  In addition, we recognize that the DHS's proposed test also included a separate requirement that the social group must exist independently of the fact of persecution.  However, this criterion is well established in our prior precedents and is already a part of the social group analysis.  *See Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74; *see also Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003) ("[A] 'particular social group' must exist independently of the persecution suffered by the applicant for asylum.").

identities or consciences.    Our interpretation also encompasses the underlying rationale of both the "particularity" and "social distinction" tests.

The "particularity" requirement relates to the group's boundaries or, as earlier court decisions described it, the need to put "outer limits" on the definition of a "particular social group." *See Castellano-Chacon v. INS*, 341 F.3d 533, 549 (6th Cir. 2003); *Sanchez-Trujillo v. INS*, 801 F.2d at 1576. The particular social group analysis does not occur in isolation, but rather in the context of the society out of which the claim for asylum arises. Thus, the "social distinction" requirement considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it. A viable particular social group should be perceived within the given society as a sufficiently distinct group. The members of a particular social group will generally understand their own affiliation with the grouping, as will other people in the particular society.[12]

Literal or "ocular" visibility is not, and never has been, a prerequisite for a viable particular social group. *See, e.g.*, *Umana-Ramos v. Holder*, 724 F.3d at 672 (interpreting social visibility "to refer to the social salience of the group in a society, or in other words, whether the set of individuals with the shared characteristic would be perceived as a group by society"); *cf. Valdiviezo-Galdamez II*, 663 F.3d at 604; *Gatimi v. Holder*, 578 F.3d at 615. An immutable characteristic may be visible to the naked eye, and it is possible that a particular social group could be set apart within a given society based on such visible characteristics. However, our use of the term "social visibility" was not intended to limit relief solely to those with outwardly observable characteristics. Such a literal interpretation would be inconsistent with the principles of refugee protection underlying the Act and the Protocol.

In fact, we have recognized particular social groups that are clearly not ocularly visible. *See, e.g.*, *Matter of Kasinga*, 21 I&N Dec. 357, 365–66 (BIA 1996) (determining that young tribal women who are opposed to female genital mutilation ("FGM") constitute a particular social group);

---

[12] Although members of a particular social group will generally understand their own affiliation with the group, such self-awareness is not a requirement for the group's existence. *See, e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d at 1089 ("[F]or example, an infant may not be aware of race, sex, or religion."). Nevertheless, as a practical matter, this point is of little import because the applicants in removal proceedings are generally professing their membership in these groups in the process of seeking asylum.

*Matter of Toboso-Alfonso*, 20 I&N Dec. 819, 822–23 (BIA 1990) (holding that homosexuals in Cuba were shown to be a particular social group); *Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988) (holding that former national police members could be a particular social group in certain circumstances). Our precedents have collectively focused on the extent to which the group is understood to exist as a recognized component of the society in question. *See Matter of E-A-G-*, 24 I&N Dec. at 594 (describing social visibility as "the extent to which members of a society perceive those with the characteristic in question as members of a social group").

### 2. "Particularity"

While we addressed the immutability requirement in *Acosta*, the term "particularity" is included in the plain language of the Act and is consistent with the specificity by which race, religion, nationality, and political opinion are commonly defined.[13] The Tenth Circuit recently noted that "the particularity requirement flows quite naturally from the language of the statute, which, of course, specifically refers to membership in a '*particular* social group.'" *Rivera-Barrientos v. Holder*, 666 F.3d at 649.

A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group. *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 76 (holding that wealthy Guatemalans lack the requisite particularity to be a particular social group). It is critical that the terms used to describe the group have commonly accepted definitions in the society of which the group is a part. *Id.* (observing that the concept of wealth is too subjective to provide an adequate benchmark for defining a particular social group).

The group must also be discrete and have definable boundaries—it must not be amorphous, overbroad, diffuse, or subjective. *See Ochoa v. Gonzales*, 406 F.3d 1166, 1170–71 (9th Cir. 2005) (stating that a particular social group must be narrowly defined and that major segments of the population will rarely, if ever, constitute a distinct social group). The particularity requirement clarifies the point, at least implicit in earlier case law, that not every "immutable characteristic" is sufficiently precise to define a particular social group. *See, e.g.*, *Escobar v. Gonzales*, 417 F.3d 363, 368 (3d Cir. 2005) (finding the characteristics of poverty,

---

[13] However, there is a critical difference between a political opinion or religious belief, which may in theory be entirely personal and idiosyncratic, and membership in a particular social group, which requires that others in the society share the characteristics that define the group.

homelessness, and youth to be "too vague and all encompassing" to set perimeters for a protected group within the scope of the Act).

### 3. "Social Distinction"

Our definition of "social visibility" has emphasized the importance of "perception" or "recognition" in the concept of "particular social group." *See Matter of H-*, 21 I&N Dec. 337, 342 (BIA 1996) (stating that in Somali society, clan membership is a "highly recognizable" characteristic that is "inextricably linked to family ties"). The term was never meant to be read literally. The renamed requirement "social distinction" clarifies that social visibility does not mean "ocular" visibility—either of the group as a whole or of individuals within the group—any more than a person holding a protected religious or political belief must be "ocularly" visible to others in society. *See, e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d at 1087–89. Social distinction refers to social recognition, taking as its basis the plain language of the Act—in this case, the word "social." To be socially distinct, a group need not be seen by society; rather, it must be perceived as a group by society. *Matter of C-A-*, 23 I&N Dec. at 956–57 (citing UNHCR Guidelines, *supra*). Society can consider persons to comprise a group without being able to identify the group's members on sight.

The examples in *Matter of Kasinga*, *Matter of Toboso-Alfonso*, and *Matter of Fuentes*, illustrate this point. It may not be easy or possible to identify who is opposed to FGM, who is homosexual, or who is a former member of the national police. These immutable characteristics are certainly not ocularly visible. Nonetheless, a society could still perceive young women who oppose the practice of FGM, homosexuals, or former members of the national police to comprise a particular social group for a host of reasons, such as sociopolitical or cultural conditions in the country. For this reason, the fact that members of a particular social group may make efforts to hide their membership in the group to avoid persecution does not deprive the group of its protected status as a particular social group. *See Rivera-Barrientos v. Holder*, 666 F.3d at 652 (stating that the social distinction requirement "does not exclude groups whose members might have some measure of success in hiding their status in an attempt to escape persecution").

The Third Circuit has indicated that it was "hard-pressed to discern any difference between the requirement of 'particularity' and the discredited requirement of 'social visibility.'" *Valdiviezo-Galdamez II*, 663 F.3d at 608. We respectfully disagree. As recognized by other courts, there is considerable overlap between the "social distinction" and "particularity" requirements, which has resulted in confusion. *See, e.g.*,

*Henriquez-Rivas v. Holder*, 707 F.3d at 1090 ("Admittedly, both BIA and our own precedent have blended the 'social visibility' and 'particularity' analysis . . . ."). "Particularity" remains essential in the interpretation of the phrase "particular social group," especially in the analysis of broadly defined social groups.

The "social distinction" and "particularity" requirements each emphasize a different aspect of a particular social group. They overlap because the overall definition is applied in the fact-specific context of an applicant's claim for relief. While "particularity" chiefly addresses the "outer limits" of a group's boundaries and is definitional in nature, *see Castellano-Chacon v. INS*, 341 F.3d at 549, this question necessarily occurs in the context of the society in which the claim for asylum arises, *see Matter of S-E-G-*, 24 I&N Dec. at 584 (inquiring whether the group can be described in sufficiently distinct terms that it "would be recognized, in the society in question, as a discrete class of persons"). Societal considerations have a significant impact on whether a proposed group describes a collection of people with appropriately defined boundaries and is sufficiently "particular." Similarly, societal considerations influence whether the people of a given society would perceive a proposed group as sufficiently separate or distinct to meet the "social distinction" test.

For example, in an underdeveloped, oligarchical society, "landowners" may be a sufficiently discrete class to meet the criterion of particularity, and the society may view landowners as a discrete group, sufficient to meet the social distinction test. However, such a group would likely be far too amorphous to meet the particularity requirement in Canada, and Canadian society may not view landowners as sufficiently distinct from the rest of society to satisfy the social distinction test. In analyzing whether either of these hypothetical claims would establish a particular social group under the Act, an Immigration Judge should make findings whether "landowners" share a common immutable characteristic, whether the group is discrete or amorphous, and whether the society in question considers "landowners" as a significantly distinct group within the society. Thus, the concepts may overlap in application, but each serves a separate purpose.

### 4. Society's Perception

The Ninth Circuit has recently observed that neither it nor the Board "has clearly specified whose perspectives are most indicative of society's perception of a particular social group." *Henriquez-Rivas v. Holder*, 707 F.3d at 1089 (suggesting that "the perception of the persecutors may matter the most" in determining a society's perception of a particular social group); *see also Rivera-Barrientos v. Holder*, 666 F.3d at 650–51

(referencing the relevant society as both "citizens of the applicant's country" and "the applicant's community"). Interpreting "membership in a particular social group" consistently with the other statutory grounds within the context of refugee protection, we clarify that a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor.

Defining a social group based on the perception of the persecutor is problematic for two significant reasons. First, it is important to distinguish between the inquiry into whether a group is a "particular social group" and the question whether a person is persecuted "on account of" membership in a particular social group. In other words, we must separate the assessment whether the applicant has established the existence of one of the enumerated grounds (religion, political opinion, race, ethnicity, and particular social group) from the issue of nexus. The structure of the Act supports preserving this distinction, which should not be blurred by defining a social group based solely on the perception of the persecutor.

Second, defining a particular social group from the perspective of the persecutor is in conflict with our prior holding that "a social group cannot be defined exclusively by the fact that its members have been subjected to harm." *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74. The perception of the applicant's persecutors may be relevant, because it can be indicative of whether society views the group as distinct. However, the persecutors' perception is not itself enough to make a group socially distinct, and persecutory conduct alone cannot define the group. *Id.*; *see also, e.g.*, *Henriquez-Rivas v. Holder*, 707 F.3d at 1102 (Kozinski, C.J., dissenting) ("Defining a social group in terms of the perception of the persecutor risks finding that a group exists consisting of a persecutor's enemies list."); *Mendez-Barrera v. Holder*, 602 F.3d at 27 ("The relevant inquiry is whether the social group is visible in the society, not whether the alien herself is visible to the alleged persecutors.").

For example, a proposed social group composed of former employees of a country's attorney general may not be valid for asylum purposes. Although such a shared past experience is immutable and the group is sufficiently discrete, the employees may not consider themselves a separate group within the society, and the society may not consider these employees to be meaningfully distinct within society in general. Nevertheless, such a social group determination must be made on a case-by-case basis, because it is possible that under certain circumstances, the society would make such a distinction and consider the shared past experience to be a basis for distinction within that society.

The former employees of the attorney general may not be considered a group by themselves or by society unless and until the government begins

persecuting them. Upon their maltreatment, it is possible that these people would experience a sense of "group," and society would discern that this group of individuals, who share a common immutable characteristic, is distinct in some significant way. *See, e.g.*, *Sepulveda v. Gonzales*, 464 F.3d 770 (regarding a social group consisting of former employees of the Colombia Attorney General's Office); *see also Cece v. Holder*, 733 F.3d at 671 (recognizing that "[a] social group 'cannot be defined *merely* by the fact of persecution' or '*solely* by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors,'" but that the shared trait of persecution does not disqualify an otherwise valid social group (quoting *Jonaitiene v. Holder*, 660 F.3d 267, 271–72 (7th Cir. 2011))). The act of persecution by the government may be the catalyst that causes the society to distinguish the former employees in a meaningful way and consider them a distinct group, but the immutable characteristic of their shared past experience exists independent of the persecution.

The persecutor's actions or perceptions may also be relevant in cases involving persecution on account of "imputed" grounds, such as where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a particular social group. *See, e.g.*, *Matter of S-P-*, 21 I&N Dec. 486, 489 (BIA 1996); *Matter of A-G-*, 19 I&N Dec. 502, 507 (BIA 1987). For example, an individual may present a valid asylum claim if he is incorrectly identified as a homosexual by a government that registers and maintains files on homosexuals―in a society that considers homosexuals a distinct group united by a common immutable characteristic. In such a case, the social group exists independent of the persecution, and the perception of the persecutor is relevant to the issue of nexus (whether the persecution was or would be on account of the applicant's imputed homosexuality).

Persecution limited to a remote region of a country may invite an inquiry into a more limited subset of the country's society, such as in *Matter of Kasinga*, 21 I&N Dec. at 366, where we considered a particular social group within a tribe. *Cf. Henriquez-Rivas v. Holder*, 707 F.3d at 1089 ("Society in general may also not be aware of a particular religious sect in a remote region."). However, the refugee analysis must still consider whether government protection is available, internal relocation is possible, and persecution extends countrywide. Section 101(a)(42) of the Act; *Gambashidze v. Ashcroft*, 381 F.3d 187, 192–94 (3d Cir. 2004); *Abdille v. Ashcroft*, 242 F.3d at 496; *Matter of C-A-L-*, 21 I&N Dec. 754, 757–58 (BIA 1997). Only when the inquiry involves the perception of the society in question will the "membership in a particular social group" ground of persecution be equivalent to the other enumerated grounds of persecution.

## C. Evidentiary Burdens

The respondent argues that a particular social group interpretation that requires more than the analysis set forth in *Matter of Acosta* imposes significant burdens on the applicant and introduces subjectivity to the analysis. Such concerns are based on an overbroad reading of the particular social group ground of persecution. In all asylum and withholding of removal cases, including those involving the other grounds of persecution, an applicant is required to establish the existence of the underlying basis for the alleged persecution. Sections 208(b)(1)(B), 241(b)(3)(C) of the Act, 8 U.S.C. §§ 1158(b)(1)(B), 1231(b)(3)(C) (2012).

For example, when an applicant makes a claim of persecution based on political opinion or religion, he or she is required to provide evidence that the claimed political or religious group exists and is recognized as such in the relevant society. *See Sandie v. Att'y Gen. of U.S.*, 562 F.3d 246, 253 (3d Cir. 2009) (denying relief where the applicant failed to establish the existence, nature, and activities of a secret society he claimed to fear); *see also, e.g.*, *Aden v. Holder*, 589 F.3d 1040, 1043–46 (9th Cir. 2009) (denying relief where the applicant failed to adequately establish the existence of a minority clan in Somalia by providing evidence "such as scholarly sources, ethnological studies, or witnesses"); *Onsongo v. Gonzales*, 457 F.3d 849, 855 (8th Cir. 2006) (denying relief where the applicant failed to adequately establish the existence of a political party).

Likewise, the applicant has the burden to establish a claim based on membership in a particular social group and will be required to present evidence that the proposed group exists in the society in question. The evidence available in any given case will certainly vary. However, a successful case will require evidence that members of the proposed particular social group share a common immutable characteristic, that the group is sufficiently particular, and that it is set apart within the society in some significant way. Evidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like may establish that a group exists and is perceived as "distinct" or "other" in a particular society. Thus, when the requirements for "membership in a particular social group" are consistent with the other grounds of persecution, the overall burdens are equivalent to those placed on applicants asserting claims based on the other grounds.

## D. Consistency with Prior Board Precedent

In its decision, the Third Circuit declined to afford *Chevron* deference to our prior interpretation of the requirements for a particular social group

because it perceived them to be inconsistent with our past decisions, in particular *Matter of Kasinga*, *Matter of Toboso-Alfonso*, and *Matter of Fuentes*. *Valdiviezo-Galdamez II*, 663 F.3d at 604, 607. In clarifying that "ocular" visibility is not required, we consider our interpretation of the phrase "membership in a particular social group" to be consistent with our prior case law.

In *Kasinga* and *Toboso-Alfonso*, we found that each applicant established an immutable characteristic in keeping with the *Acosta* standard, and we held that they established viable particular social groups. *Matter of Kasinga*, 21 I&N Dec. at 365–66 (young women of the Tchamba-Kunsuntu Tribe who had not been subjected to FGM, as practiced by that tribe, and who opposed the practice); *Matter of Toboso-Alfonso*, 20 I&N Dec. at 822–23 (persons identified as homosexuals by the Cuban Government).

The Third Circuit recognized that the members of each of these groups "have characteristics which are completely internal to the individual and cannot be observed or known by other members of the society in question (or even other members of the group) unless and until the individual member chooses to make that characteristic known." *Valdiviezo-Galdamez II*, 663 F.3d at 604. However, the unobservable nature of the immutable characteristics involved in *Kasinga* and *Toboso-Alfonso* did not preclude the societies in question from considering certain women of the tribe or homosexuals, respectively, as distinct groups that were set apart within the society.

In *Matter of Toboso-Alfonso*, the Government did not challenge the Immigration Judge's finding that homosexuality was an immutable characteristic. The proposed group in that case, homosexuals in Cuba, was sufficiently particular because it was a discrete group with well-defined boundaries. The group was based on an immutable characteristic that provided an adequate benchmark for defining the members of the group, and it did not rely on a vague or subjective characteristic. The record established the existence of a Cuban governmental office that registered and maintained files on homosexuals. *Matter of Toboso-Alfonso*, 20 I&N Dec. at 820, 822. The applicant testified that residents threw eggs and tomatoes at him when he was being forced to leave the country because of his status as a homosexual, and he submitted evidence that suspected homosexuals were subjected to physical examinations, interrogations, and beatings. *Id.* at 820–21. On those facts, it was clear that people in Cuban society considered homosexuals to be a discrete and distinct group within the society and that a homosexual in Cuba would have generally understood his or her affiliation with the grouping. The group was therefore particular and socially distinct within the society in question.

In *Matter of Kasinga*, 21 I&N Dec. at 365–66, we found that the social group met the immutable characteristic test set forth in *Acosta*. The proposed group of young women of a certain tribe who had not been subjected to FGM and opposed the practice was sufficiently particular because it presented a group that had clear and definable boundaries. The record contained objective evidence regarding the prevalence of FGM in the society in question and the expectation that women of the tribe would undergo FGM. *Id.* at 361, 367. Based on these facts, we found that people in the Tchamba-Kunsuntu Tribe would generally consider women who had not undergone FGM and opposed the practice to be a discrete and distinct group that was set apart in a significant way from the rest of the society. Such women would clearly understand their affiliation with this grouping. Thus, the proposed group was particular and was perceived as socially distinct within the society in question.

In *Matter of Fuentes*, the fundamental characteristic at issue was also not visible. However, we did not hold that "former member[s] of the national police of El Salvador" necessarily constituted a viable particular social group. *Matter of Fuentes*, 19 I&N Dec. at 662. Rather, we merely recognized that the applicant's status as a former policeman was an immutable characteristic because it was beyond his capacity to change, and we noted that it is "*possible* that mistreatment occurring because of such a status in appropriate circumstances *could* be found to be persecution on account of political opinion or membership in a particular social group." *Id.* (emphasis added). The applicant in *Fuentes* presented some evidence of social distinction, because the national police played a high-profile role in combating guerrilla violence, and a witness testified that "guerrillas had the names of the people who had been in the service" and targeted and killed former service members. *Id.* at 659, 661. However, because we held that the applicant did not show that the harm he feared bore a nexus to his status as a former member of the national police, we did not fully assess the factors that underlie particularity and social distinction. *Id.* at 661–63.

In *Matter of C-A-*, we found that "noncriminal drug informants working against the Cali drug cartel" in Colombia were not a particular social group, and we emphasized that "[s]ocial groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups." *Matter of C-A-*, 23 I&N Dec. at 957, 959–60 (finding that members of the applicant's society would not "recognize a social group based on informants who act out of a sense of civic duty rather than for compensation"). However, we also included language highlighting the relative ocular invisibility of confidential informants. *Id.* at 959–60. To the extent that *Matter of C-A-* has been

246

interpreted as requiring literal or "ocular" visibility, we now clarify that it does not.

Since *Matter of Acosta*, we have also recognized "particular social groups" in cases involving immutable characteristics within discrete segments of the population. *Matter of V-T-S-*, 21 I&N Dec. 792, 798 (BIA 1997) (Filipinos of mixed Filipino-Chinese ancestry); *Matter of H-*, 21 I&N Dec. at 342–43 (members of the Marehan subclan of Somalia who share ties of kinship and linguistic commonalities). The particular social groups in these cases satisfied the social distinction test because the record in each case contained objective evidence establishing the existence of the groups as distinct within the society in question. *Matter of V-T-S-*, 21 I&N Dec. at 798 (citing the State Department Profile on the Philippines as stating that approximately 1.5% of the Philippine population has an identifiable Chinese background); *Matter of H-*, 21 I&N Dec. at 342–43 (citing country reports discussing various clans).

Our interpretation of the phrase "membership in a particular social group" originated with the immutable characteristics test in *Matter of Acosta*. In response to the evolution of social group claims presented, we announced the addition of the "particularity" and "social visibility" requirements in *Matter of S-E-G-* and *Matter of E-A-G-*. Our transition to the term "social distinction" is intended to clarify the requirements announced in those cases; it does not mark a departure from established principles. We would reach the same result in *Matter of S-E-G-* and *Matter of E-A-G-* if we were to apply the term "social distinction" rather than "social visibility." Therefore, we need not revisit cases where we used the term "social visibility." *See INS v. Abudu*, 485 U.S. 94, 107 (1998); *Matter of S-Y-G-*, 24 I&N Dec. 247, 257 (BIA 2007) (explaining that an incremental or incidental change does not meet the requirements for untimely motions to reopen and that even a change in law is insufficient absent evidence that the prior version was meaningfully different); *Matter of G-D-*, 22 I&N Dec. 1132, 1135 (BIA 1999) (stating that an incremental development in case law does not warrant sua sponte reopening).[14]

### E. International Interpretations

Although the statutory terms "refugee" and "particular social group" occur against the backdrop of the Protocol and the Convention,

---

[14] The clarifications provided by our decision in this matter should only alter the result in cases where a literal or "ocular" visibility standard was improperly determinative of the outcome in the case.

international interpretations of those terms are not controlling here. *INS v. Aguirre-Aguirre*, 526 U.S. at 427–28.

We recognize that our interpretation of the ambiguous phrase "particular social group" differs from the approach set forth in the UNHCR's social group guidelines, which sought to reconcile two international interpretations that had developed over the years. UNHCR Guidelines, *supra*, at 2–3; *see also Valdiviezo-Galdamez II*, 663 F.3d at 615 n.4 (Hardiman, J., concurring). The UNHCR advocates an alternative approach, which permits an individual to establish a particular social group based on "protected characteristics" or "social perception" but does not require both. UNHCR Guidelines, *supra*, at 2–3. However, the European Union adopted a "particular social group" definition that departs from the UNHCR Guidelines by requiring a social group to have both an immutable/fundamental characteristic and social perception.[15]

While the views of the UNHCR are a useful interpretative aid, they are "not binding on the Attorney General, the BIA, or United States courts." *INS v. Aguirre-Aguirre*, 526 U.S. at 427. Indeed, the UNHCR has disclaimed that its views have such force and has taken the position that the determination of "refugee" status is left to each contracting State. *Id.* at 428 (citing Office of the UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. II, at 1 (Geneva, 1979)); *see also INS v. Cardoza-Fonseca*, 480 U.S. at 439 n.22.

We believe that our interpretation in *Matter of S-E-G-* and *Matter of E-A-G-*, as clarified, more accurately captures the concepts underlying the United States' obligations under the Protocol and will ensure greater

---

[15] Article 10.1(d) of the European Union's guidelines states:

> [A] group shall be considered to form a particular social group where in particular:
>
>> —members of that group share an innate characteristic, or a common background that cannot be changed, or share a characteristic or belief that is so fundamental to identity or conscience that a person should not be forced to renounce it, *and*
>>
>> —that group has a distinct identity in the relevant country, because it is perceived as being different by the surrounding society.

Directive 2011/95/EU, of the European Parliament and of the Council of 13 December 2011 on Standards for the Qualification of Third-Country Nationals or Stateless Persons as Beneficiaries of International Protection, for a Uniform Status for Refugees or for Persons Eligible for Subsidiary Protection, and for the Content of the Protection Granted (recast), 2011 O.J. (L 337) 9, 16, *available at* http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=4f197df02 (emphasis added).

consistency in the adjudication of asylum claims under the Act. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967; *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837. Unlike the UNHCR's alternative approach, we conclude that a particular social group must satisfy both the "protected characteristic" and "social perception" approaches, in addition to the particularity requirement, as described above.

## V.  APPLICATION TO THE RESPONDENT

In our prior decision in this case, we rejected the respondent's gang-related claim based on the reasoning set forth in *Matter of S-E-G-* and *Matter of E-A-G-*. In *Matter of S-E-G-*, 24 I&N Dec. at 582, we denied a gang-related asylum claim asserting a proposed social group of "Salvadoran youths who have resisted gang recruitment, or family members of such Salvadoran youth." The applicant's membership in a particular social group was not established because he did not show that the proposed group was sufficiently particular or socially distinct, that is, recognized in the society in question as a discrete class of persons. *Id.* at 584–87. His fear was based on his individual response to the gang's efforts to increase its ranks, not on persecution aimed at his membership in a group. *See INS v. Elias-Zacarias*, 502 U.S. at 483 (rejecting a guerrilla recruitment claim where the applicant failed to establish that the persecutor had a motive other than increasing the size of its forces). Similarly, the applicant in *Matter of E-A-G-* did not establish that the proposed group, "persons resistant to gang membership," was a particular social group. *Matter of E-A-G-*, 24 I&N Dec. at 594–95 ("The focus is not with statistical or actuarial groups, or with artificial group definitions. Rather, the focus is on the existence and visibility of the group in the society in question and on the importance of the pertinent group characteristic to the members of the group.").[16]

While there is no universal definition of a "gang," it is generally understood to be "a criminal enterprise having an organizational structure, acting as a continuing criminal conspiracy, which employs violence

---

[16] We also rejected the applicant's second proposed social group of "young persons who are perceived to be affiliated with gangs." *Matter of E-A-G-*, 24 I&N Dec. at 593. We held that membership, or perceived membership, in a criminal gang cannot constitute a particular social group because "[t]reating affiliation with a criminal organization as being protected membership in a social group is inconsistent with the principles underlying the bars to asylum and withholding of removal based on criminal behavior." *Id.* at 596; *see also Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007).

and any other criminal activity to sustain the enterprise."     UNHCR, *Guidance Note on Refugee Claims Relating to Victims of Organized Gangs* 1 n.3 (Mar. 31, 2010), *available at* http://www.unhcr.org/refworld/docid /4bb21fa02.html (quoting the Federal Bureau of Investigation's definition of a gang).

The UNHCR has recognized that "[g]ang-related violence may be widespread and affect large segments of society, in particular where the rule of law is weak.  Ordinary people may be exposed to gang-violence simply because of being residents of areas controlled by gangs."  *Id.* para. 10, at 4.  Although the UNHCR indicates that certain marginalized social groups may be specifically targeted by gangs, it also noted that "a key function of gangs is criminal activity.  Extortion, robbery, murder, prostitution, kidnapping, smuggling and trafficking in people, drugs and arms are common practices employed by gangs to raise funds and to maintain control over their respective territories."  *Id.* para. 8, at 3.

In *Matter of S-E-G-*, 24 I&N Dec. at 588, we also noted that the evidence of record indicated that El Salvador suffered from widespread gang violence, stating that "victims of gang violence come from all segments of society, and it is difficult to conclude that any 'group,' as actually perceived by the criminal gangs, is much narrower than the general population of El Salvador."  Although this evidence of indiscriminate gang violence and civil strife was largely dispositive of the applicant's ability to establish the proposed group's existence in the society in question, it also undermined his attempt to establish a nexus between any past or feared harm and a protected ground under the Act.

Against the backdrop of widespread gang violence affecting vast segments of the country's population, the applicant in *Matter of S-E-G-* could not establish that he had been targeted on a protected basis.  *See Al-Fara v. Gonzales*, 404 F.3d at 740; *Abdille v. Ashcroft*, 242 F.3d at 494−95; *Matter of N-M-A-*, 22 I&N Dec. at 323, 326.  Although he was subjected to one of the many different criminal activities that the gang used to sustain its criminal enterprise, he did not demonstrate that he was more likely to be persecuted by the gang on account of a protected ground than was any other member of the society.  *Matter of S-E-G-*, 24 I&N Dec. at 587 ("[G]angs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power.").

The prevalence of gang violence in many countries is a large societal problem.   The gangs may target one segment of the population for recruitment, another for extortion, and yet others for kidnapping, trafficking in drugs and people, and other crimes.  Although certain segments of a population may be more susceptible to one type of criminal activity than

another, the residents all generally suffer from the gang's criminal efforts to sustain its enterprise in the area. A national community may struggle with significant societal problems resulting from gangs, but not all societal problems are bases for asylum. *See Konan v. Att'y Gen. of U.S.*, 432 F.3d at 506; *Al Fara v. Gonzales*, 404 F.3d at 740; *Abdille v. Ashcroft*, 242 F.3d at 494–95; *see also Matter of Sosa Ventura*, 25 I&N Dec. at 394 (discussing the history of Temporary Protected Status and the fact that individuals fleeing life-threatening natural disasters or a generalized state of violence were not entitled to either asylum or withholding of removal). Congress may choose to provide relief to those suffering from difficult situations not covered by asylum and withholding of removal. *See, e.g.*, section 244(a)(1) of the Act, 8 U.S.C. § 1254a(a)(1) (2012); Ruth Ellen Wasem & Karma Ester, Cong. Research Serv., RS 20844, *Temporary Protected Status: Current Immigration Policy and Issues* 2 (2010), *available at* http://fpc.state.gov/documents/organization/137267.pdf.

Nevertheless, we emphasize that our holdings in *Matter of S-E-G-* and *Matter of E-A-G-* should not be read as a blanket rejection of all factual scenarios involving gangs. *Matter of S-E-G-*, 24 I&N Dec. at 587 (recognizing that the evidence of record did not "indicate that Salvadoran youth who are recruited by gangs but refuse to join (or their family members) would be 'perceived as a group' by society, or that these individuals suffer from a higher incidence of crime than the rest of the population"). Social group determinations are made on a case-by-case basis. *Matter of Acosta*, 19 I&N Dec. at 233. For example, a factual scenario in which gangs are targeting homosexuals may support a particular social group claim. While persecution on account of a protected ground cannot be inferred merely from acts of random violence and the existence of civil strife, it is clear that persecution on account of a protected ground may occur during periods of civil strife if the victim is targeted on account of a protected ground. *See Konan v. Att'y Gen. of U.S.*, 432 F.3d at 506; *Matter of Villalta*, 20 I&N Dec. 142, 147 (BIA 1990); *see also, e.g.*, *Ochave v. INS*, 254 F.3d 859, 865 (9th Cir. 2001) ("Asylum generally is not available to victims of civil strife, unless they are singled out on account of a protected ground.").

## VI. CONCLUSION

We interpret the "particular social group" ground of persecution in a manner consistent with the other enumerated grounds of persecution in the Act and clarify that our interpretation of the phrase "membership in a particular social group" requires an applicant for asylum or withholding of removal to establish that the group is (1) composed of members who share

a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question. Not every "immutable characteristic" is sufficiently precise to define a particular social group. The additional requirements of "particularity" and "social distinction" are necessary to ensure that the proposed social group is perceived as a distinct and discrete group by society. We further clarify that a particular social group does not require literal or "ocular" visibility.

The respondent has requested a remand and the DHS has expressed that it has no opposition. Because the respondent's proposed particular social group has evolved during the pendency of his appeal, our guidance on particular social group claims has been clarified since this case was last before the Immigration Judge, and the Third Circuit has indicated that a remand may be appropriate, we will remand this case. A remand will enable the Immigration Judge to engage in any fact-finding that may be necessary to resolve the issues in this case, consistent with standard Immigration Court practice and procedure. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (discussing the Board's limited fact-finding authority); *see also Matter of Jimenez*, 21 I&N Dec. 567, 570 n.2 (BIA 1996) (recognizing that we generally do not consider an issue raised for the first time on appeal).

Further, a remand is appropriate to allow the Immigration Judge to revisit the issues of the respondent's possible relocation and the Honduran Government's inability or unwillingness to control the gangs. *See Khan v. Att'y Gen. of U.S.*, 691 F.3d 488, 496 (3d Cir. 2012) ("The source of the persecution must be the government or forces that 'the government is unwilling or unable to control." (quoting *Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007) (internal quotation marks omitted))); 8 C.F.R. § 1208.13(b)(1)(i)(B), (2)(ii), (3) (2013) (relating to an applicant's relocation). Although the Immigration Judge initially denied the respondent's asylum claim on these grounds, they were the basis on which the Third Circuit granted his first petition for review and they have not yet been resolved. *See, e.g.*, *Valdiviezo-Galdamez II*, 663 F.3d at 588–89 & n.4; *Valdiviezo-Galdamez I*, 502 F.3d at 292–93.

The clarification and guidance provided by our decision in this matter may have an impact on the validity of the respondent's proposed group, which, in turn, may affect whether any persecution would be "on account of" his membership in such group.[17] On remand, both parties will have

---

[17] The DHS properly notes that the court's decision in *Valdiviezo-Galdamez I* was based on a modification to the respondent's proposed particular social group. The court omitted the "because they oppose the gangs" portion of the respondent's proposed group. *Valdiviezo-Galdamez I*, 502 F.3d at 290. The removal of the "opposition" element materially changes the analysis of group composition and may affect the

(continued . . .)

an opportunity to present updated country conditions evidence and arguments regarding the respondent's particular social group claim, and the Immigration Judge may conduct further proceedings as is deemed appropriate under the circumstances. Accordingly, the record will be remanded to the Immigration Judge.

**ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.

_____

Immigration Judge's assessment whether persecution was or would be on account of the respondent's membership in the group he has proposed. Thus, the Immigration Judge may address the issue of nexus on remand.