[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17475
Non-Argument Calendar
_____

Agency No. A088-011-681

WILLIAMS BAINA ANTEZAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(December 6, 2017)

Before MARCUS, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Williams Baina Antezan,[1] a native and citizen of Bolivia, petitions for review of the Board of Immigration Appeals' ("BIA") final order affirming the Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").   The BIA's decision rested on its conclusion that Antezan failed to meet the particular social group requirement for asylum and withholding of removal and to demonstrate it was more likely than not that he would be tortured such that he would be eligible for CAT relief.  After careful review, we deny Antezan's petition.

## I.  BACKGROUND

Antezan obtained a multiple entry visa and, beginning in 2007, was admitted to the United States several times.  In 2010, after having entered the United States on five previous occasions, remaining very close to the legal time limit, and then engaging in a consistent pattern of short exits, the Department of Homeland Security ("DHS") detained Antezan upon his arrival at the Miami airport.  Based on this pattern of behavior, which—along with his inconsistent statements, unemployment, and inability to explain his pattern of visits—apparently evidenced that he intended to immigrate to the United States without an immigrant visa, DHS

---

[1] The government refers to the petitioner as "Williams Baina Antenaz" or, alternatively, "Baina."  We note that Antenaz appears to be a misspelling of the petitioner's name.  Petitioner's brief does not indicate his preferred name; we refer to him herein as Antezan.

obtained an order of removal for Antezan. In response, Antezan claimed that he feared returning to Bolivia. An asylum officer found that his fear was credible, so Antezan was paroled into the United States and his initial removal proceedings were terminated.

## A. Application for Asylum, Withholding of Removal, and CAT Relief

Antezan thereafter applied for asylum, withholding of removal, and CAT relief. In his application, Antezan stated that he was the financial leader of a Bolivian Company, Orion Bolivia. He and Jose Moscoso formed Orion Bolivia to invest funds in the New York Stock Exchange. They began with 24 investors, including themselves, and eventually acquired 900 investors. They entrusted the company's money to a man named Hector Gallardo; Gallardo in turn invested the money in another company and lost it all. Orion Bolivia investors soon learned of the losses, and some threatened retaliation against Antezan and Moscoso.

Antezan alleged that the investors threatened to retaliate against him and his family with violence. One investor, a nephew of the President of Bolivia, threatened to use his influence to have Antezan extradited from the United States to Bolivia where he would be tortured. Two investors threatened to contact Bolivian military members who had contacts in the United States to take justice into their own hands.

3

After he filed his application, Antezan again was placed in removal proceedings.

## B. Hearing Before the IJ

At his hearing before the IJ, Antezan testified that he could not return to Bolivia because of the threat of retaliation by the people who had invested in his company. He asserted that he feared persecution on account of his membership as one of a group of 24 original investors in Orion Bolivia, which he asserted qualified as a "particular social group," a protected ground under the Immigration and Nationality Act ("INA"). He acknowledged that he had never been physically attacked, but asserted that he and his family members had been harassed and threatened because investors were angry that he had lost their money.

Antezan testified that, before he left Bolivia, a woman threatened him at his office, telling him she would bring others to beat him. In March 2008 he left Bolivia for the United States; while he was in the United States a group (the leader of which apparently had a sibling in the military) came to Antezan's mother's home (where Antezan had been living before he left the country) with the intention of holding his mother hostage. The group attempted to open the door but could not get in, so they tried to burn the house down with Antezan's mother, siblings, and niece inside. Television reporters arrived on the scene and thwarted the group's plan.

4

Antezan further testified that, while he was in the United States in April 2008, a man named Jose Pena Rieta wrote him to explain that 900 people, presumably the 900 Orion Bolivia investors, did not believe Antezan that the fraud had been committed by Gallardo. Rieta said he wanted Antezan's head and, if he could not get Antezan, he would go after Antezan's family because he knew where they lived. Antezan testified that his brother was attacked the same month and beaten by a group of people. One man in the group pointed a revolver at Antezan's brother and said he would not stop until he killed Antezan.

Antezan testified to other harassment he experienced after investors lost their money in Orion Bolivia. The nephew of the Bolivian president said he was going to use his influence to have Antezan extradited to Bolivia to have him tortured and killed. A man named Edwin Martinez Onya sent Antezan an email complaining that Onya's family had been physically abused because people thought he was involved in Orion Bolivia. Onya told Antezan that if Onya's family was hurt, he would find Antezan and kill him.

Antezan testified that his sister Juana Maria Baina was harassed on three occasions because of her relation to Antezan. First, she was physically attacked at work by people who pulled her hair. Second, she received a phone call from a man who told her that he was going to kill Antezan and that she and her children were

5

going to be kidnapped and killed.  Third, a woman threatened Baina and passed out pamphlets denigrating her reputation.

Finally, Antezan testified that two investors reported to him that they had received death threats.

The IJ took administrative notice that Gallardo was convicted of fraud and sentenced to 60 months' imprisonment.  Antezan testified that he cooperated with the criminal prosecution against Gallardo.  As documentary support for his application, Antezan submitted press releases, signed by himself and Moscoso, about Orion Bolivia's loss of the investors' money.  He submitted a newspaper article reporting that Orion Bolivia was being prosecuted for fraud.  He also submitted emails in which Orion Bolivia investors expressed frustration with Antezan and Moscoso.  None of the documents, however, mentioned a group of 24 original investors.

Antezan submitted the 2011 State Department Country Report on Human Rights Practices on Bolivia, which indicated that the principle human rights problems reported in the country were arbitrary or unlawful deprivation of life, arbitrary arrest and detention, and denial of a fair public trial.  Antezan's lawyer argued that the State Department report showed that individuals in Bolivia take the law into their own hands, using torture and lynching to exact justice.  Antezan

submitted two articles about lynching in Bolivia, documenting the lynching of suspected witches, thieves, and rapists.

## C. IJ's Decision and Appeal to BIA

The IJ denied Antezan's application. With respect to asylum and withholding of removal, the IJ concluded that Antezan failed to demonstrate past persecution or an objectively reasonable fear of future persecution on account of membership in a particular social group. Although the IJ found Antezan's testimony to be credible, he nonetheless concluded that there was insufficient evidence that the harassment Antezan suffered while he was still in Bolivia amounted to past persecution. The IJ further concluded that, although Antezan had a well-founded fear of future persecution based on threats and attacks on his family after his departure from Bolivia, the persecution Antezan feared was personal and retaliatory, not based on a protected ground. The social group Antezan advanced—24 original Orion Bolivia investors—failed to qualify as a particular social group under the INA because it lacked any immutable characteristic or social distinction and could not be defined with sufficient particularity to delimit its membership. For these reasons, the IJ denied Antezan asylum and withholding of removal.

As to CAT relief, the IJ stated that Antezan's torture claim rested on the fact that some of the aggrieved investors were connected with military members or the

Bolivian government, and that if Antezan returned to Bolivia he would be tortured by some government or military official. This, the IJ concluded, was speculative and insufficient to establish that it was more likely than not that Antezan would be subjected to torture if he returned to Bolivia. Thus, the IJ denied Antezan's application for relief under CAT.

Antezan appealed the IJ's decision to the BIA, which affirmed and dismissed the appeal. As to asylum and withholding of removal, the BIA considered the threats against Antezan cumulatively and concluded that they amounted to harassment but not persecution. Threats and harm directed against Antezan's family members, the BIA noted, were not directed towards Antezan specifically. Moreover, the BIA agreed with the IJ that the threats Antezan received were related to a personal dispute rather than on account of a protected particular social group. As to CAT relief, the BIA agreed with the IJ that Antezan's support for his application was speculative and insufficient to satisfy the burden of proof.

## D. Remand to the BIA

Antezan petitioned this Court for review, and the government filed an unopposed motion to remand to the BIA for a renewed determination of whether Antezan's proposed group of 24 original investors constituted a particular social group under *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (B.I.A. 2014), or,

8

alternatively, for the BIA to conduct a mixed motive analysis to determine whether membership in such a group would constitute one central reason for the feared persecution.  We granted the government's motion.

On remand, the BIA again dismissed the appeal, incorporating by reference its previous decision.  The BIA concluded that Antezan's proposed social group did not amount to a particular social group under the INA because it lacked the requisite social distinction.  Specifically, Antezan failed to provide sufficient evidence to demonstrate that the proposed group was perceived by Bolivian society as a particular social group.  Rather, the BIA opined, the evidence showed that the group of 24 original Orion Bolivia investors were perceived as a group only by others who lost money they had invested in the company.

Relatedly, the BIA determined that Antezan failed to establish the requisite nexus between the harm he experienced and a protected ground.  In making this finding, the BIA relied on the IJ's conclusion that the alleged persecutors were motivated by a desire for personal revenge for a failed business venture, rather than on account of an enumerated ground.  And Antezan had shown no other central reason for being targeted, so he could not prevail even under a mixed motive theory.

Antezan now petitions this Court for review.

9

## II.  STANDARDS OF REVIEW

We review only the BIA's decision as the final judgment, except to the extent that the BIA expressly adopts the IJ's opinion.  *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001).  If the BIA adopts the IJ's reasoning, we will review the IJ's decision as well.  *Id.*  Here, because the BIA expressly agreed with the IJ in several of its determinations—including that the threats Antezan received were related to a personal dispute rather than on account of a protected particular social group and that Antezan failed to prove a clear probability that he would be tortured—we review both opinions on these points.

We review *de novo* the BIA's legal conclusions, including whether an alleged group qualifies as a "particular social group" under the INA.  *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016).  We review factual findings, including credibility determinations, under the substantial-evidence test, under which we will affirm findings that are "supported by reasonable, substantial, and probative evidence on the record considered as a whole," viewing "the record evidence in the light most favorable to the agency's decision and draw[ing] all reasonable inferences in favor of that decision."  *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1286 (11th Cir. 2005) (internal quotation marks omitted).

## III. APPLICABLE LAW

An applicant for asylum must meet the INA's definition of "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). The definition includes:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). Thus, to satisfy the definition of "refugee," the applicant must, "with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a well-founded fear that the statutorily listed factor will cause future persecution." *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006) (internal quotation marks omitted). Antezan's application for asylum and withholding of removal asserted that he was a member of a particular social group; that is, the original 24 investors in Orion Bolivia.

The BIA has held that a "particular social group" must be (1) composed of members who share a common characteristic (2) defined with particularity, and (3) socially distinct within the society in question. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237; *see Gonzalez*, 820 F.3d at 404-05 (deferring to the BIA's interpretation of "particular social group"). To be socially distinct, a group must be perceived by society as a group. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 240.

11

The burden is on the applicant to "present evidence that the proposed group exists in the society in question." *Id.* at 244.

To establish eligibility for withholding of removal, an applicant must demonstrate that if he were removed, his life or freedom would be threatened because of his race, religion, nationality, membership in a particular social group, or political opinion. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005). The standard for withholding of removal is "more stringent" than the asylum standard. *Id.* An applicant for withholding of removal must demonstrate that it is more likely than not that he will be persecuted or tortured upon returning to his country of origin. *Id.*

To obtain relief under CAT, an applicant must prove that it is "more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, a decisionmaker should consider all evidence relevant to the possibility of future torture, including, but not limited to: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is unlikely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. *Id.* § 1208.16(c)(3).

### III.  DISCUSSION

**A.  Asylum and Withholding of Removal**

Antezan contends that the BIA's denial of asylum and withholding of removal was erroneous.  Specifically, he argues that the BIA erred when it concluded that he failed to establish that he suffered past persecution and was targeted as a member of a particular social group.  Accepting for argument's sake that Antezan demonstrated past persecution and accepting the IJ's finding that he demonstrated a well-founded fear of future persecution, we agree with the BIA that he nonetheless failed to prove that any persecution was or would be based all or in part on his membership in a particular social group.

Antezan argues that the 24 original investors' shared experience as investors and victims of Gallardo's scheme is a common immutable characteristic that renders them a particular social group under the INA.  This shared experience, Antezan asserts, is fundamental to the investors' individual identities in society. And, Antezan maintains, based on the original investors' interpersonal interactions with other investors, Bolivian society associates the group with Orion Bolivia and the financial losses the company suffered.

Unfortunately, Antezan's evidence demonstrates only that those who harassed him and his family understood him to be part of a group; he has offered argument, but no evidence, to establish that the group of 24 original investors is

13

recognized as distinct in broader society. The only evidence Antezan proffered that might establish his status to society were press releases and a news article about Orion Bolivia's losses, but those documents never identified a group of 24 investors; rather, they only identified Moscoso and Antezan. Antezan has offered no evidence linking the group of 24 original investors to any societal perception. Thus, the BIA was correct to conclude that Antezan failed to show that the group of 24 original investors comprised a particular social group under the INA. The BIA therefore appropriately denied Antezan's application for asylum and withholding of removal.

## B.  CAT Relief

Antezan next contends that the BIA's rejection of his application for CAT relief was not based on substantial evidence. He asserts his evidence showed that members of the Bolivian government and military threatened him and his family with torture and death and that human rights violations and corruption are widespread problems in Bolivia. These he says, coupled with the threats and personal attacks on his family while he was living in the United States, demonstrate his eligibility for relief.

We cannot say, however, that the BIA's rejection of Antezan's application for CAT relief based on the IJ's findings was unsupported by substantial evidence. The IJ found that Antezan had not been tortured in the past and that, although

14

Antezan's family members were harassed, none was tortured.  These findings are amply supported by the record.  The IJ found also that, although Antezan arguably could not relocate to another part of Bolivia, a small country, to avoid harassment, there was no evidence of gross, flagrant, or mass violations of human rights in Bolivia.  Antezan has not argued that this finding is unsupported by substantial evidence.

The remainder of Antezan's evidence, including threats by individuals related to the Bolivian President and a member of the military—was, according to the IJ, too speculative to satisfy Antezan's heavy burden to show it was more likely than not he would be tortured if he returned to Bolivia.  Viewing the evidence Antezan presented, as we must, in the light most favorable to the IJ's and BIA's decisions, we cannot say that the conclusion that the evidence was speculative was unsupported by the record as a whole.  *Forgue*, 401 F.3d at 1286.  Thus, we do not disturb the BIA's rejection of Antezan's application for CAT relief.

## IV.  CONCLUSION

For these reasons, we deny Antezan's petition for review.

**PETITION DENIED.**

15