12-4987-ag
Silvana Paloka v. Eric H. Holder, Jr.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2013

Heard: May 21, 2014                    Decided: August 7, 2014

Docket No. 12-4987-ag

- - - - - - - - - - - - - - - - - - - - - - - - -

SILVANA PALOKA,
      Petitioner,

              v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL
      Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WALKER, and CABRANES, <u>Circuit Judges</u>.

Appeal from the December 4, 2012, order of the Board of Immigration Appeals dismissing Petitioner's application for asylum and other relief.  Petitioner challenges the rejection of her claim that she was persecuted on account of membership in a particular social group.

VACATED and REMANDED.

> Kai W. De Graaf, New York, NY, for Petitioner.
>
> Margot L. Carter, Trial Attorney, Office of Immigration Litigation, Washington, D.C., (Stuart F. Delery, Assistant Attorney General for the Civil

Division of the U.S. Department of Justice, Leslie McKay, Assistant Director of the Office of Immigration Litigation, Washington, D.C., on the brief), for Respondent.

JON O. NEWMAN, Circuit Judge.

The primary issue on this appeal is whether "young Albanian women" or "young Albanian women between the ages of 15 and 25" qualify as a "particular social group" for asylum purposes. 8 U.S.C. § 1101(a)(42)(A). Petitioner Silvana Paloka appeals from the December 4, 2012, order of the Board of Immigration Appeals ("BIA") dismissing her application for asylum and other relief. See In re Silvana Paloka, No. A093-341-960 (B.I.A. Dec. 4, 2012).

In view of the BIA's two recent precedential decisions clarifying its interpretation of "particular social group" for asylum purposes, we will remand so that the BIA may determine, in the first instance, whether Paloka's proposed social groups qualify for asylum purposes.

Background

After arriving in the United States, Paloka, a native of Albania, timely applied for asylum. She was then nineteen years old and unmarried. The Immigration Judge ("IJ") deemed

-2-

Paloka credible; therefore, we use her testimony and the IJ's factual findings to set forth the facts of her case.

    <u>Facts of alleged persecution.</u> Paloka's parents lived in Berdice, Albania, in a section of town that had previously been sectored off as a camp for those who had spoken out against the communist regime. Her parents and grandparents had been persecuted for their anti-communist stance from the 1960s to the fall of the communist regime in the early 1990s. The family's land was taken and her grandparents were interned in the camp in 1965. Her father was disabled from a beating by government agents in 1985. Paloka was born in the camp in 1989.

    When she was eighteen, Paloka got a job as a hairdresser in the nearby town. She walked a considerable distance to get to and from her home. In 2008, on three separate occasions during trips to and from work, Paloka was pressured to become a prostitute. The first occurred in May 2008. Paloka was returning home from work when a man she had never seen before approached her. He said he wanted to meet her parents, marry her, and take her to Greece. Paloka said she was not interested and began to walk home, but the man said she would see him again. He got into a police car, and it drove off. Paloka told her employer, Rita Mendoja, about

the incident and was allowed to leave work earlier when the streets were less deserted.

In June 2008, a police car stopped beside Paloka while she was walking home. Two men got out of the car, one in a police uniform and the other in civilian clothes. Paloka recognized the man in civilian clothes as the man who had stopped her in May. The man in the police uniform told Paloka that he knew her family was not from the area, her family had been persecuted in the past, her parents were disabled, and her brothers were too young to protect her. He then threatened to kill her and her family if she did not accede to the wishes of the other man. Paloka understood that the men wanted to sell her into prostitution. At that moment, three of Paloka's neighbors happened to pass by and provided her with a ride home.

Two days after the second incident, Paloka met with both a local official and a village leader to inform them of the incident and request protection. Both leaders said that they could not help her.

A third incident occurred in July 2008. Paloka left work late at 8:30 p.m. For this reason, Mendoja accompanied her home. On the road, the women saw a police car stopped on

an empty road.  The same two men who had threatened Paloka previously stepped out of the car.  They grabbed Paloka by her arms and hair and kicked her.  Mendoja screamed and tried to fight with them.  The men tried to push Paloka into the police car.  During the struggle, an armed shepherd came on the scene.  The shepherd pointed his rifle at the men and threatened to kill them unless they let Paloka and Mendoja go. The two men got back into the police car and departed.  The shepherd accompanied the women to Paloka's home.

Paloka told her parents about the final incident, and they all agreed that she should go live with her aunt and uncle in the main city of Shkoder until she could leave the country.  Paloka did so, and left Albania and came to the United States in August 2008.

Administrative proceedings. Before the IJ, Paloka testified that she would be afraid to live anywhere in Albania because the threat of human trafficking for prostitution existed everywhere in the country. The 2008 State Department Trafficking in Persons Report ("Trafficking Report") states that most Albanian sex trafficking victims are women and girls

-5-

between the ages of 15 and 25.[1]  The Report also notes that "[t]he Government of Albania does not fully comply with the minimum standards for the elimination of trafficking; however, it is making significant efforts to do so." Trafficking Report 60. Specifically, the Report noted a concern that "public officials . . . participated in or facilitated human trafficking."  Id.  At Paloka's hearing, the IJ observed that "forced . . . prostitution through sex trafficking . . . occurs relatively often in Albania[,] which is recognized as one of the countries where this is more common than many other countries."

To bring her generalized sex trafficking claim within the required category of a "particularized social group" Paloka asserted membership in three groups: "unmarried women," "young women in Albania," and "unmarried young women in Albania."  At oral argument, she suggested that her third group could be narrowed by a specific age limitation of 15 to 25 years.

---

[1]The report can be found online. See 2008 U.S. Department of State, Trafficking in Persons Report (2009), available at http://www.state.gov/j/tip/rls/tiprpt/2009/ (last accessed June 6, 2014, and available in Clerk of Court's case file).

The IJ denied Paloka's application for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ provided two alternative reasons for denying Paloka's claim of membership in a "particular social group." First, the IJ determined that all of her proposed groups were "too broad." Second, the IJ decided that Paloka was not targeted "on account of" her membership in a particular social group but instead because she was a "good target for criminal opportunistic behavior."

The BIA did not reach the question of whether the incidents amounted to persecution. Instead, the BIA stated that the proposed groups were "not defined with sufficient particularity to be cognizable particular social groups." The BIA also rejected her alternative social group based on her family's political ties because Paloka had not shown that she was targeted on account of her family's political history; instead, the BIA concluded that she "was approached because she was a good target for criminal opportunistic behavior."

## Discussion

### I. Standard of Review and Statutory Scheme

Because the BIA did not expressly adopt the IJ's decision, but "its brief opinion closely track[ed] the IJ's

reasoning," we have reviewed the opinions of both the IJ and the BIA "for the sake of completeness." Zaman v. Mukasey, 514 F.3d 233, 237 (2d Cir. 2008) (internal quotation omitted). We review factual findings under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Questions of law, as well as the application of legal principles to undisputed facts, are reviewed de novo. See Guan Shan Liao v. United States, 293 F.3d 61, 66 (2d Cir. 2002).

To establish eligibility for asylum or withholding of removal, an applicant must show persecution, or fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. §§ 1101(a)(42); 1231(b)(3). Direct governmental action is not required for a claim of persecution. Private acts can constitute persecution if the government "is unable or unwilling to control it." Rizal v. Gonzales, 442 F.3d 84, 92 (2d Cir. 2006); see also Pavlova v. I.N.S., 441 F.3d 82, 85 (2d Cir. 2006). To succeed on a particular social group claim, the applicant must establish both that the group itself was cognizable, see Ucelo-Gomez v. Mukasey, 509 F.3d 70, 73

-8-

(2d Cir. 2007), and that the alleged persecutors targeted the applicant "on account of" her membership in that group, see 8 U.S.C. § 1101(a)(42)(A).

Paloka contends that her membership in a particular social group is the reason she has been persecuted and the reason she fears future persecution. The primary question in this case is whether the social group she has described satisfies the statutory standard of section 101(a)(42)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101(a)(42)(A). Courts review de novo the legal determination of whether a group constitutes a "particular social group" under the INA. See, e.g., Cece v. Holder, 733 F.3d 662, 668 (7th Cir. 2013) (in banc); Ayala v. Holder, 640 F.3d 1095, 1096-97 (9th Cir. 2011); Castaneda-Castillo v. Holder, 638 F.3d 354, 363 (1st Cir. 2011).

II. BIA's Interpretation of "Particular Social Group"

Congress did not define "membership in a particular social group" in the INA, as the BIA has recognized, see In re M-E-V-G-, 26 I. & N. Dec. 227, 230 (B.I.A. 2014) ("M-E-V-G-"). The BIA has interpreted this phrase through a series of precedential opinions. See M-E-V-G-, 26 I. & N. Dec. at 231-

33 (collecting cases).  We give the BIA interpretations Chevron deference because the statutory phrase is vague.  See Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 842–43 (1984); cf. Scialabba v. Cuellar de Osario, 134 S. Ct. 2191, 2203-07 (2014) (plurality opinion); see also Ucelo-Gomez, 509 F.3d at 72.

The BIA's attempts to give meaning to "particular social group" began in 1985.  The first decision interpreted "membership in a particular social group" to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic."  In re Acosta, 19 I & N Dec. 211, 233 (B.I.A. 1985).  Additionally, the common characteristic that defines the group "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Id.

The BIA has clarified its interpretation by specifying two additional factors that a qualifying social group must have, "social visibility" and "particularity." See M-E-V-G-, 26 I. & N. Dec. at 232 (interpreting In re C-A-, 23

-10-

I. & N. Dec. 951, 959-61 (B.I.A. 2006)). Under these additional requirements, the BIA explained, the particular social group in question must have "well-defined boundaries" and be "'recognizable' as a discrete group by others in the society." Id. (quoting and interpreting In re A-M-E- & J-G-U-, 24 I. & N. Dec. 69, 74-76 (B.I.A. 2007)).

In response to a Third Circuit decision that declined to afford deference to the BIA's view of the "particularity" and "social visibility" requirements, see Valdiviezo-Galdamez v. Attorney General of U.S., 663 F.3d 582 (3d Cir. 2011), the BIA clarified its interpretation of "particular social group" in two companion cases decided after the pending petition for review was filed: M-E-V-G- and In re W-G-R-, 26 I. & N. Dec. 208 (B.I.A. 2014) (W-G-R-"). M-E-V-G- summarized the BIA's criteria for identification of "particular social group" as follows:

> (1) composed of members who share a common immutable characteristic,
>
> (2) defined with particularity, and
>
> (3) socially distinct within the society in question.

M-E-V-G-, 26 I. & N. Dec. at 237.

-11-

The reformulated test and accompanying analysis clarified several issues. First, the BIA renamed the "social visibility" requirement as "social distinction." Id. at 236. It stressed that this requirement "was never intended to, and does not require, literal or 'ocular' visibility." Id. at 234.[2] "To be socially distinct, a group need not be seen by society; rather, it must be perceived as a group by society. Society can consider persons to comprise a group without being able to identify the group's members on sight." Id. at 240 (internal citation omitted).

As to the particularity requirement, the BIA stressed that the social group in question "must be defined by characteristics that provide a clear benchmark for determining who falls within the group." Id. at 239. "The group must also be discrete and have definable boundaries – it must not be amorphous, overbroad, diffuse, or subjective." Id. "Societal considerations," the BIA explained, "will necessarily play a factor" in determining whether a group "is

---

[2]As the BIA explained: "Contrary to our intent, the term 'social visibility' has led some to believe that literal, that is, 'ocular' or 'on-sight,' visibility is required to make a particular social group cognizable under the Act. See Valdiviezo-Galdamez, 663 F.3d at 606-07." M-E-V-G-, 26 I. & N. Dec. at 236.

discrete or is, instead, amorphous." W-G-R-, 26 I. & N. Dec. at 214.

The BIA also clarified that in determining particularity and social distinction what matters is whether society as a whole views a group as socially distinct, not the persecutor's perception. M-E-V-G-, 26 I. & N. Dec. at 242. Although a persecutor's perception can be indicative of whether society views a group as distinct, a persecutor's perception alone is not enough to establish a cognizable social group. See id. "Persecutory conduct aimed at a social group cannot alone define the group, which must exist independently of the persecution." W-G-R-, 26 I. & N. Dec. at 215. Of course, the BIA emphasized, persecution can be the "catalyst" for a group of individuals to "experience a sense of 'group'" and for society to "discern that this group of individuals . . . is distinct in some significant way." M-E-V-G-, 26 I. & N. Dec. at 243. And, the BIA continued, there must be an "immutable characteristic [that] exists independent of the persecution." Id.

After an individual shows that she is a member of a cognizable social group, she must demonstrate that the

persecution was "on account of" her membership in that particular social group. See W-G-R-, 26 I. & N. Dec. at 223. Whether the requisite nexus exists "depends on the views and motives of the persecutor." Id. at 223-24.

Circuit case law before the BIA's recent decisions was not consistent. Most pertinent to the pending case, with respect to an asylum applicant fearing being forced into prostitution, the Seventh Circuit had approved a group of young women living alone in Albania, Cece, 733 F.3d at 671, and the Sixth Circuit had rejected as too "generalized" and "sweeping" a claimed group of "young (or those who appear to be young), attractive Albanian women who are forced into prostitution," Rreshpja v. Gonzales, 420 F.3d 551, 555 (6th Cir. 2005). In a non-precedential decision, our Court found it unnecessary to adjudicate a group defined as young unmarried Albanian women, see Gjura v. Holder, 502 F. App'x, 91 (2d Cir. 2012), for lack of evidence of a nexus to the alleged group, see id. at 92.

Several circuit decisions have divided on whether other proposed  groups of women qualified as a "particular social group." *Compare* Sarhan v. Holder, 658 F.3d 649, 654

-14-

(7th Cir. 2011) (approving proposed group of women who "in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being killed without any protection from the Jordanian government"), Al-Ghorbani v. Holder, 585 F.3d 980, 996 (6th Cir. 2009) (approving proposed group of women who opposed the repressive and discriminatory Yemeni cultural and religious customs that prohibit mixed-class marriages and require paternal consent for marriage), Agbor v. Gonzales, 487 F.3d 499, 502 (7th Cir. 2007) (approving proposed group of woman who are opposed to and fear genital mutilation), *and* Yadegar-Sargis v. INS, 297 F.3d 596, 603 (7th Cir. 2002) (approving proposed group of Christian women in Iran who do not wish to adhere to the Islamic female dress code), *with* Rivera-Barrinetos v. Holder, 666 F.3d 641, 653 (10th Cir. 2012) (rejecting proposed group of Salvadoran women between ages 12 and 25 who resisted gang recruitment for lack of evidence that group is perceived to be a distinct social group in El Salvador), Kante v. Holder, 634 F.3d 321, 327 (6th Cir. 2011) (rejecting proposed group of women subjected to rape as a method of government control in part because of proposed group's generalized and far reaching nature*)*, Faye v. Holder,

580 F.3d 37, 42 (1st Cir. 2009) (rejecting proposed group of "women who had a child out of wedlock/are considered adulterers because they gave birth to a child allegedly not their husband's/have been abused by their husbands" for lack of evidence that group is a recognized social group in Senegal), and Sharif v. INS, 87 F.3d 932, 936 (7th Cir. 1996) (stating that the cognizability of a group of Iranian women who had become "westernized" while living in the United States was "debatable at best").

II. Consequence of BIA Clarification

M-E-V-G- and W-G-R- have clarified the legal landscape for adjudicating "particular social group" claims. Although we are not presented with the paradigmatic situation requiring a remand – where an agency has not made any decision on the pertinent issue, see Gonzales v. Thomas, 547 U.S. 183, 186 (2006); Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 17 (2002); Ucelo-Gomez v. Gonzales, 464 F.3d 163, 169-70 (2d Cir. 2006), remand is appropriate in this case following the agency's clarification of its approach to that issue. Cf. NLRB v. Coca-Cola Bottling Co., 55 F.3d 74, 78 (2d Cir. 1995) (remand following intervening change of policy).

-16-

"[E]very consideration that classically supports the law's ordinary remand requirement does so here. The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." Ventura, 537 U.S. at 17.

The new clarifying opinions are important for cases, like Paloka's, that straddle the line between individuals threatened by state-sponsored or state-condoned criminality on account of their membership in a particular social group and individuals threatened only because they live in a country with pervasive criminality. While continuing to emphasize that a particular social group is not cognizable merely because "'members have been subjected to harm,'" see M-E-V-G-, 26 I. & N. Dec. at 242 (quoting In re A-M-E- & J-G-U-, 24 I & N. Dec. 69, 74 (B.I.A. 2007)), the BIA stressed that the "shared trait of persecution does not disqualify an otherwise valid social group" and that persecution can be the "catalyst" for societal recognition. See id. at 243.

In this case, the IJ noted that it seemed that "the factors [Paloka] relied upon [as] constituting the elements of

her particular social group are those elements which make her a good target for criminal opportunistic behavior." However, being a victim of a crime or even being a likely target for criminal opportunistic behavior does not necessarily preclude the existence of a valid asylum claim if the claimant would likely be targeted because of her membership in a sufficiently defined social group. See M-E-V-G-, 26 I. & N. Dec. at 243; see also Cece, 733 F.3d at 671-72. Indeed, those facing persecution may often be the most vulnerable to crimes, especially if the government condones or aids the perpetrators.

Instead of focusing on the perpetrator's views, the recent precedential opinions emphasize that the first step of the analysis — whether the group is cognizable — focuses primarily on how the society in which the group exists views the group. Only at the second step of the analysis — whether the persecution was "on account of" the victim's status as a member of the group — does the perpetrator's mindset become the center of attention.

The groups proposed by Paloka based on age and gender require reconsideration in light of the BIA's new precedential

decisions, and that reconsideration would benefit from a somewhat more extended analysis of Paloka's claim than has thus far occurred.  That analysis might, for example, consider the Seventh Circuit's observation that both gender and youth are immutable characteristics that fit within the broad definition set out in <u>Acosta</u>, 19 I. & N. Dec. at 233.  <u>See</u> <u>Cece</u>, 733 F.3d at 671.  The BIA might also explain whether it accepts the IJ's view that the happenstance arrivals of helpful neighbors and a shepherd to extricate Paloka from a dangerous situation indicate that she will not be at risk in the future.[3]

A final reason for remand is that Paloka has refined her particular social group during her appeal.  In <u>M-E-V-G-</u>, the BIA remanded to the IJ, in part, because the petitioner's "proposed particular social group has evolved during the pendency of the appeal."  26 I. & N. Dec. at 252. Here, too,

---

[3]We can safely assume that on reconsideration the BIA will not embrace the IJ's view that to show a "probability" of future persecution, which he defined as a 50 percent likelihood, Paloka had to present evidence that half of all unmarried young Albanian women are being forced into prostitution. <u>See</u> IJ Opinion 19. Probability of facing persecution does not require a probability of 50 percent. <u>See</u> <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 431 (1987) (probability of "well-founded fear" of facing persecution may be as little as ten percent); <u>Kyaw Zwar Tum v. U.S.I.N.S.</u>, 445 F.3d 554, 565 (2d Cir. 2006) (same).

the petitioner has refined the contours of her proposed social group during the proceedings to include a specific age range of 15 to 25, a range that finds support in the evidence. See Trafficking Report 2008 U.S. State Department Trafficking in Persons Report (2009), available at http://www.state.gov/j/tip/rls/tiprpt/2009/ (last accessed June 6, 2014, and available in Clerk's Office file). This group can be evaluated on remand because it is a subclass that is "specific" and "subsidiary" to the broader class first proposed. See Steevenez v. Gonzales, 476 F.3d 114, 117 (2d Cir. 2007); cf. Gill v. INS, 420 F.3d 82, 86 (2d Cir. 2005).

We conclude that it is necessary to remand to the BIA for a redetermination of whether Paloka has identified a cognizable social group in light of the BIA's recent clarifications.[4] Of course, in remanding for reconsideration, we make no determination as to whether Paloka has identified

---

[4]There is no need to remand Paloka's claim that she was persecuted because of her status as a young, unmarried women who is a member of family that was persecuted by the former communist regime. Neither the BIA nor the IJ denied that claim based on a failure to establish a cognizable social group. Rather it appears that they assumed that the group could be cognizable but found that there was nothing in the record to indicate that she was targeted because of her family's political beliefs or previous persecution. Paloka fails to show that there is substantial evidence to compel the opposite conclusion.

or can identify a qualifying "particular social group," nor whether she can discharge her burden to prove by credible evidence that she was persecuted or reasonably fears persecution "on account of" her membership is such a group, *see* 8 U.S.C. § 1101(a)(42)(A).

## Conclusion

Accordingly, the decision of the BIA is vacated, and the case is remanded for reconsideration.