17-982-ag
Ordonez Azmen v. Barr

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2019

(Argued: November 26, 2019      Decided: July 13, 2020)

Docket No. 17-982-ag

_____

MARIO ORDONEZ AZMEN, AKA DAVID PEREZ, AKA MARIO ENRIQUE
ORDONEZ AZMEN,

*Petitioner*,

v.

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

*Respondent*.

_____

Before:

KATZMANN, *Chief Judge*, CALABRESI, and LOHIER, *Circuit Judges*.

Mario Ordonez Azmen petitions for review of a decision of the Board of Immigration Appeals (BIA) denying his motion to remand and dismissing his appeal of the denial of his asylum and statutory withholding claims under the Immigration and Nationality Act. The BIA did not adequately explain its conclusion that Ordonez Azmen's proposed social group of former gang members in Guatemala was not particular. Nor did the BIA adequately explain its reasons for denying Ordonez Azmen's motion to remand based on evidence of new country conditions. Finally, we hold that under 8 U.S.C. § 1158(a)(2)(D),

changed circumstances presenting an exception to the one-year deadline for filing an asylum application need not arise prior to the filing of the application, and the BIA erred when it refused to consider Ordonez Azmen's alleged changed circumstances on the ground that the change occurred while his application was pending. We **GRANT** the petition, **VACATE** the BIA's decision, and **REMAND** for reconsideration of Ordonez Azmen's application for asylum and statutory withholding of removal and his motion to remand, consistent with this opinion.

ZACHARY A. ALBUN, Immigration and Refugee Clinical Program, Harvard Law School, Cambridge, MA (Charles Roth, National Immigrant Justice Center, Chicago, IL, Stacy Taeuber, Benjamin Casper Sanchez, Federal Immigration Litigation Clinic, University of Minnesota Law School, Minneapolis, MN, *on the brief*), *for Petitioner* Mario Ordonez Azmen.

MARGARET J. PERRY (Andrew C. MacLachlan, Kevin J. Conway, *on the brief*), Office of Immigration Litigation, *for* Joseph H. Hunt, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *for Respondent* William P. Barr, United States Attorney General.

LOHIER, *Circuit Judge*:

Mario Ordonez Azmen petitions for review of a decision by the Board of Immigration Appeals (BIA) denying his application for asylum and statutory withholding of removal and denying his motion to remand to the Immigration Judge (IJ) for consideration of new country conditions evidence. For the reasons that follow, we grant the petition, vacate the BIA's decision, and remand to the

BIA for reconsideration of Ordonez Azmen's application for asylum and statutory withholding of removal and his motion to remand consistent with this opinion.

BACKGROUND

Ordonez Azmen is a native and citizen of Guatemala and a former member of the Mara 18 gang there. After defecting from the gang, he left Guatemala and entered the United States. In May 2008 the Department of Homeland Security (DHS) started removal proceedings against Ordonez Azmen, who conceded removability. In October 2008 Ordonez Azmen filed an application for asylum, statutory withholding of removal, and relief under the Convention Against Torture (CAT), claiming that he feared he would be killed by associates of Mara 18 if he returned to Guatemala.

Ordonez Azmen testified at a merits hearing before the IJ in May 2010. According to his testimony, which the IJ credited, Ordonez Azmen joined a local branch of the Mara 18 gang in or around 1998 in his hometown in Guatemala. As far as Ordonez Azmen knew, members of the branch were "just a group of youth spending time and having fun" and were not "involved in gang and illegal activity." Certified Administrative Record (C.A.R.) at 498. Ordonez Azmen tried

to leave Mara 18 in 2001 or 2002, when a change in the gang's leadership forced him and other Mara 18 members to commit robberies and assaults, but gang members made it clear that he could not leave "unless [he] was dead." Id. at 546. He left home to stay with his sister in another town, but the threats continued. He tried to report the threats, but the police told him he had no proof, discouraged him from complaining, and questioned him about his gang affiliation. At a certain point, he even feared that the police were in the pocket of Mara 18 or another gang and might retaliate against him.

Ordonez Azmen's experience in Guatemala with Mara 18 after he tried to leave was not unique. Other Mara 18 members who tried to get out were also threatened. Some were beaten or even killed by the gang. In November 2002, for example, David "El Baqui" Perez, Ordonez Azmen's friend and the former leader of Ordonez Azmen's local Mara 18 gang, was murdered after he disagreed with the gang's violent activities.

In the summer of 2003 Ordonez Azmen fled Guatemala for the United States. In Guatemala, meanwhile, violence against former Mara 18 members continued unabated. After Ordonez Azmen arrived in the United States, he heard from friends in Guatemala that in May 2004 Mara 18 members had

4

murdered Aroldo Cardona, another former member who was threatened for trying to leave the gang. A third former gang associate, Piter Giovanni, was murdered in April 2010, just two weeks before Ordonez Azmen's merits hearing. Ordonez Azmen also testified about four more Mara 18 members who were killed, although the timing and circumstances of their deaths were unclear.

After the merits hearing, the IJ granted CAT relief, finding that it was more likely than not that Ordonez Azmen would be targeted by his former gang associates if he returned to Guatemala, and that the Guatemalan government was aware of the threat but unwilling or unable to protect him. The IJ rejected Ordonez Azmen's other claims for relief. The IJ first concluded that the asylum claim was untimely. See 8 U.S.C. § 1158(a)(2)(B). The IJ then determined that Ordonez Azmen failed to adduce facts establishing the extraordinary circumstances needed to permit an otherwise untimely claim to proceed under the exception in 8 U.S.C. § 1158(a)(2)(D). The IJ also rejected Ordonez Azmen's statutory withholding claim. Citing BIA precedential decisions relating to gang membership in El Salvador, Honduras, and Colombia—but not Guatemala—the IJ asserted that the category "Mara 18 [members] who resist further gang involvement" was not a cognizable social group because it was linked to

5

resistance to gang membership or opposition to gang activity and thus lacked sufficient social distinction[1] and particularity. C.A.R. 507.

In a June 27, 2013 decision, the BIA affirmed the IJ's decision as to both Ordonez Azmen's asylum claim (as untimely) and his statutory withholding claim.[2]

Ordonez Azmen asked us to review the BIA's decision. By summary order, we denied his petition for review as it related to asylum, but granted his petition relating to statutory withholding of removal and remanded to the BIA with instructions to reconsider the agency's particular social group analysis in view of intervening decisions from the BIA and this Court. Azmen v. Holder (Azmen I), 593 F. App'x 65 (2d Cir. 2014). We noted that three intervening decisions, In re M-E-V-G-, 26 I. & N. Dec. 227 (B.I.A. 2014), In re W-G-R-, 26 I. & N. Dec. 208 (B.I.A. 2014), and Paloka v. Holder, 762 F.3d 191 (2d Cir. 2014), had clarified the particularity and social distinction requirements of a particular

---

[1] The IJ's decision referred to "social visibility," as the social distinction element was then called. The BIA later renamed "social visibility" to "social distinction" in order to clarify that "literal or ocular visibility is not required." In re M-E-V-G-, 26 I. & N. Dec. 227, 228 (BIA 2014) (quotation marks omitted). The shift in terminology did not reflect any change in the underlying substantive standard, see id., and we therefore use the more recent term "social distinction" throughout.
[2] DHS did not appeal the grant of CAT withholding.

social group under the Immigration and Naturalization Act (INA), but had not been applied to Ordonez Azmen's claim for withholding of removal. Azmen I, 593 F. App'x at 67–68.

Ordonez Azmen petitioned to have us rehear the denial of his asylum claim. We granted the petition on the ground that the BIA had "mischaracterized and ignored" evidence of Piter Giovanni's murder in April 2010. Azmen v. Lynch (Azmen II), 625 F. App'x 561, 562 (2d Cir. 2015). We intimated that evidence of the murder might constitute changed circumstances that excused the "tardiness" of Ordonez Azmen's application given the one-year deadline for asylum applications. Id. at 563. We also emphasized that "[w]hile both this Court and the BIA have assumed that the changed circumstances" under 8 U.S.C. § 1158(a)(2)(D) "must predate the asylum application, such assumptions are mere dicta." Id. Requiring petitioners to raise each subsequent changed circumstance in an entirely new application, we warned, could "creat[e] a trap for those who are ill-informed or ill-advised" and spur unnecessary filings. Id. We therefore remanded to the BIA to consider in the first instance whether events giving rise to a changed circumstances exception "must occur before the application is filed, requiring a successive asylum application to be filed

subsequent to the changed circumstances for a petitioner to potentially receive relief, or [whether] such changed circumstances may occur after the application is filed, permitting them to be considered in determining a pending asylum application's timeliness." Id. (quotation marks omitted). In addition, we advised the BIA that a precedential opinion on the question "would be especially useful." Id.

Back in front of the BIA, Ordonez Azmen moved to remand to the IJ for further fact-finding. To that end, he submitted about two hundred pages of new country conditions evidence, including media accounts, country conditions reports, and an expert affidavit, which he argued "show[ed] [that] former gang members are perceived as a discrete, distinct group by the Guatemalan government, by the gangs themselves, and by Guatemalan society in general." C.A.R. 23.

The BIA eventually denied Ordonez Azmen's motion to remand to the IJ and, despite our earlier suggestion that it issue a published decision, dismissed his appeal by unpublished decision. It held that the alleged change in circumstance—the 2010 murder of Giovanni—must have occurred before, not after, Ordonez Azmen's otherwise untimely asylum application was filed in

8

order to excuse the untimeliness. "[I]f the alleged changed circumstances are substantially related or cumulative to the original untimely filed application," the agency explained, "then the application is a continuance of the original claim and should continue to be deemed untimely . . . regardless of whether a second application is submitted or not." C.A.R. 4. And even if "the 2010 murder of a gang member might be evidence that conditions in Guatemala have possibly worsened for [Ordonez Azmen] to some degree," the BIA reasoned that "this is not the same as presenting evidence that circumstances have sufficiently changed to excuse an untimely asylum application." Id. at 6.

The BIA concluded that Ordonez Azmen's claims for asylum and statutory withholding and his motion to remand failed for the separate reason that his proposed social group did not meet the particularity requirement for a "cognizable particular social group" under the INA. Id. at 7. Although Ordonez Azmen's proposed group comprised former Mara 18 gang members who lived in Guatemala, the BIA relied on a decision in which it had rejected as insufficiently particular a proposed group of "former gang members in El Salvador who have

9

renounced their gang membership." Id. (citing W-G-R-, 26 I. & N. Dec. at 221–23); id. at 8.[3]

This petition for review followed.

DISCUSSION

I

We review de novo the BIA's decision to deny the application, which presents the purely legal question whether Ordonez Azmen's proposed group constitutes a "particular social group." See Yan Yang v. Barr, 939 F.3d 57, 61 (2d Cir. 2019); Paloka, 762 F.3d at 195; see also Wangchuck v. Dep't of Homeland Sec., 448 F.3d 524, 528 (2d Cir. 2006). Unlike precedential opinions, "[n]on-precedential opinions, such as the BIA opinion here, cannot claim Chevron deference." Huo Qiang Chen v. Holder, 773 F.3d 396, 403 (2d Cir. 2014).

We first consider Ordonez Azmen's challenge to the BIA's finding that his proposed social group (former members of the Mara 18 gang in Guatemala who defected) was insufficiently particular to support his asylum and statutory withholding claims.

---

[3] We also asked the BIA to consider on remand whether there were differences between the scope of relief under CAT withholding and statutory withholding, see Azmen I, 593 F. App'x at 67, but the BIA did not reach this question, see C.A.R. 8. We do not revisit the issue here, as it does not affect the outcome of this appeal.

The INA provides that individuals with a "well-founded fear of persecution on account of . . . membership in a particular social group" may be eligible for asylum. 8 U.S.C. § 1101(a)(42)(A); see id. § 1158(b)(1)(A). The BIA has interpreted "membership in a particular social group" to impose three requirements: (1) immutability, meaning that members of the group must "share a common, immutable characteristic," In re Acosta, 19 I. & N. Dec. 211, 233 (B.I.A. 1985), overruled in part on other grounds by In re Mogharrabi, 19 I. & N. Dec. 439, 441 (B.I.A. 1987); (2) particularity, meaning that the group must "be discrete and have definable boundaries," M-E-V-G-, 26 I. & N. Dec. at 239; and (3) social distinction, meaning that the group must "be perceived as a group by society," id. at 240. See generally Paloka, 762 F.3d at 195–96 (summarizing BIA precedents).

M-E-V-G- and W-G-R- , the two main BIA precedential decisions that describe the particularity requirement, explain that "[t]he particular social group analysis does not occur in isolation, but rather in the context of the society out of which the claim for asylum arises." M-E-V-G-, 26 I. & N. Dec. at 238; see W-G-R-, 26 I. & N. Dec. at 214. The BIA's analysis thus consists of a "fact-specific inquiry," W-G-R-, 26 I. & N. Dec. at 209, which "focuses primarily on how the

society in which the group exists views the group," Paloka, 762 F.3d at 198.

"[T]here is considerable overlap between the 'social distinction' and 'particularity' requirements . . . because the overall definition [of a particular social group] is applied in the fact-specific context of an applicant's claim for relief." M-E-V-G-, 26 I. & N. Dec. at 240–41. In W-G-R-, the BIA reaffirmed the link between particularity and the views of the society in question. Particularity, the BIA said, "require[s] inquiry into whether the group can be described in sufficiently distinct terms that it would be recognized, in the society in question, as a discrete class of persons." W-G-R-, 26 I. & N. Dec. at 214 (quotation marks omitted). "The boundaries of a group are not sufficiently definable unless the members of society generally agree on who is included in the group." Id. at 221. The particularity inquiry is thus closely tied to the society out of which the claim arises.

Two aspects of the BIA's analysis of the particularity requirement in Ordonez Azmen's case cast serious doubt on whether it comports with M-E-V-G- and W-G-R-. First, the BIA observed that Ordonez Azmen's proposed social group was "too loosely defined" because "Guatemalans may not agree on how long one will be considered a former gang member or even who is considered to

12

be a former gang member." C.A.R. 7 (emphasis added). But the particularity inquiry focuses on whether there is evidence that members of the relevant society actually "generally agree on who is included in the group," not whether they "may" (or may not) agree. W-G-R-, 26 I. & N. Dec. at 221. Under its own precedents, therefore, the BIA had to consider whether the record evidence demonstrated that Guatemalans actually share a common definition of who counts as a former gang member who defected. It is not clear from its decision that the BIA did so in this case. Second, the BIA concluded that it saw no "meaningful distinction between [Ordonez Azmen's] situation and that of the applicant" in W-G-R-, who was from El Salvador, "regarding whether their proposed particular social groups are sufficiently particular and distinct." C.A.R. 7. But the BIA's own precedential decisions require the agency to determine on a case-by-case basis whether a group is a particular social group for the purposes of an asylum claim. This involves a fact-intensive inquiry as to whether the group is recognized by the particular society in question. "To be consistent with its own precedent," then, "the BIA may not reject a group solely because it had previously found a similar group in a different society to lack . . . particularity." Pirir-Boc v. Holder, 750 F.3d 1077, 1084 (9th Cir. 2014).

13

It is not clear to us whether the BIA rejected Ordonez Azmen's proposed group in Guatemala based solely on the superficial fact that the rejected proposed group in W-G-R- also involved "former gang members." We have some doubt that the BIA specifically considered Guatemalan society's perception of that group as it exists in Guatemala. The BIA rather appears to have imposed a general rule, untied to any specific country or society, that groups consisting of "former gang members" are insufficiently particularized. If so, the agency failed to adhere to its own precedents disclaiming per se rules and requiring a fact-based inquiry into the views of the relevant society (here, Guatemala, according to Ordonez Azmen).

II

We turn next to the BIA's denial of Ordonez Azmen's motion to remand for consideration of new evidence, which we review for abuse of discretion. See Li Yong Cao v. U.S. Dep't of Justice, 421 F.3d 149, 157 (2d Cir. 2005). We "will find such abuse if the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the Board has acted in an arbitrary or capricious manner." Id. (quotation marks omitted).

14

The BIA denied the motion to remand only because the new country condition evidence "does not address or affect" particularity. C.A.R. 8. But Ordonez Azmen's new evidence, including expert testimony, reflected widespread violence against former gang members in Guatemala, their social marginalization and stigmatization, and media coverage of them as a group. The BIA failed to explain why the evidence he presented would not help its inquiry. The BIA also failed to justify its conclusory refusal to consider this evidence, a refusal that appears to contradict its decision in M-E-V-G-. In that case, the BIA recognized that the type of evidence Ordonez Azmen marshalled here would be relevant to the "perception of the society in question." M-E-V-G-, 26 I. & N. Dec. at 242; see also id. at 244. Evidence of "shared past experience[s]" of persecution or "maltreatment," the BIA explained, can function as a "catalyst" that spurs "a sense of group" among members and causes "society [to] discern that this group of individuals . . . is distinct in some significant way." Id. at 242–43 (quotation marks omitted); see also Paloka, 762 F.3d at 196.

We conclude that the BIA abused its discretion when it denied Ordonez Azmen's motion to remand in this way. Its decision is "devoid of any reasoning" and "contains only summary or conclusory statements." Li Yong Cao, 421 F.3d

15

at 157. So we cannot confidently determine whether the agency applied the correct particularity standard. The summary nature of the agency's denial also prevents us from assessing if the decision "inexplicably departs" from the agency's own precedent in M-E-V-G- regarding particularity. Id.

### III

The asylum statute, 8 U.S.C. § 1158, in general requires that an applicant for asylum file an application "within 1 year after the date of the alien's arrival in the United States," id. § 1158(a)(2)(B). As we explain in more detail below, an exception to the one-year filing requirement exists if changed circumstances materially affect an applicant's eligibility for asylum. See id. § 1158(a)(2)(D). Relying on § 1158(a)(2)(B), the BIA separately concluded that Ordonez Azmen's claim was untimely because his application was filed more than one year after his entry into the United States. In response, Ordonez Azmen pointed to the 2010 murder of his former Mara 18 associate as a change in circumstances that excused any untimeliness, even though the murder post-dated his application. The BIA refused to consider the murder, citing its requirement that an otherwise untimely application for asylum be filed "within a reasonable period given those changed circumstances." 8 C.F.R. § 1208.4(a)(4)(ii) (quotation marks omitted);

16

see C.A.R. 5.  The agency believed that the murder could not count as a changed circumstance under the exception in 8 U.S.C. § 1158(a)(2)(D) because it postdated Ordonez Azmen's application.

The BIA misinterpreted the asylum statute.  As the BIA should have done, we begin "with the text [of the statute], and we look to both the language itself and the specific context in which that language is used."  Yan Yang, 939 F.3d at 61 (quotation marks omitted).  An exception to § 1158(a)(2)(B)'s one-year filing requirement provides that "notwithstanding" the one-year deadline a late asylum application "may be considered . . . if the [applicant] demonstrates . . . either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one-year] period."  8 U.S.C. § 1158(a)(2)(D).  This language plainly ties changed circumstances to the agency's power to consider an otherwise untimely application, not to the applicant's ability to file the application.  Beyond that, "[t]he statute does not specify a sequence as between changed circumstances and an asylum application."  Azmen II, 625 F. App'x at 563.

Thus, an adequate showing of changed circumstances materially affecting eligibility is all that the words of the statute require to excuse untimeliness and to permit the agency to consider the application. At the point that such a showing is made, the "normal bars to applications <u>do</u> <u>not</u> <u>apply</u>." <u>Yan Yang</u>, 939 F.3d at 63 (emphasis added).

Beyond the text, our reading of § 1158(a)(2) is consistent with other provisions of the INA, including the other clause of § 1158(a)(2)(D). <u>See</u> <u>United</u> <u>States v. Epskamp</u>, 832 F.3d 154, 162 (2d Cir. 2016) ("A particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." (quotation marks omitted)). Section 1158(a)(2)(D) creates an alternative exception to the one-year filing deadline, pursuant to which the agency may consider an otherwise untimely application based on "extraordinary" circumstances that "relat[e] to the delay in filing." 8 U.S.C § 1158(a)(2)(D). As we know, the "changed" circumstances exception in § 1158(a)(2)(D) does not similarly require that the "changed circumstances" relate to the delay. Another exception to the filing deadline allows the agency to consider asylum claims based on changed circumstances that arise <u>after</u> an application is denied. <u>See</u> 8

18

U.S.C. § 1158(a)(2)(C)–(D). And yet another provision, 8 U.S.C. § 1229a(c)(7)(C)(ii), permits an applicant to move to reopen a final order of removal based on certain changed circumstances that could not have been discovered or presented earlier.

Our reading of § 1158(a)(2)(D) and these other provisions of the INA persuades us that Congress did not intend to bar the agency from considering the asylum application of an applicant who shows changed circumstances that first arise after the application is filed, and did not require that the changed circumstances even relate to the delay in filing. To the contrary, Congress clearly contemplated that the agency could consider a change in circumstances such as the one alleged here at several stages in an applicant's proceedings—even when the change bears no relation to the reason for the delay, and even as late as a motion to reopen a final order of removal.

The BIA's own regulations and decisions confirm our view that changed circumstances do not need to relate to the delay in filing and instead need only "materially affect" eligibility for asylum. Compare 8 C.F.R. § 1208.4(a)(4)(i) ("The term 'changed circumstances' . . . shall refer to circumstances materially affecting the applicant's eligibility for asylum."), with id. § 1208.4(a)(5) ("The

19

term 'extraordinary circumstances' . . . shall refer to events or factors directly related to the failure to meet the 1-year deadline."). In In re C-W-L-, 24 I. & N. Dec. 346 (B.I.A. 2007), the BIA construed § 1158(a)(2)(D) and related regulations to permit an updated asylum application based on changed circumstances "at any time during proceedings before the entry of a final order of removal or within the 90-day deadline for a motion to reopen." Id. at 353. This rule would include a change that arises, as here, while an asylum application is pending.

Finally, the legislative history relating to § 1158(a)(2)(D) is inconclusive on the precise issue before us, and it does not confirm the Government's position. We see no historical evidence that Congress intended to require that a changed circumstance arise prior to the filing of an otherwise-untimely asylum application. To the contrary, in recommending the near-final version of the statutory exception to the one-year filing deadline, the House Judiciary Committee suggested that it was meant to operate alongside a short application that could be updated with more information over time and "generous[ly] . . . amend[ed]" throughout the asylum process. H.R. Rep. No. 104-469, pt. 1, at 176 (Mar. 4, 1996). Similarly, nothing in the legislative history suggests that the Senate thought to confine relevant changes in circumstances to those that arose

before the asylum application was filed. The original Senate Judiciary Committee bill on the issue stated that "[g]ood cause" excusing an untimely asylum filing "could include, but is not necessarily limited to, circumstances that changed after the applicant entered the U.S. and that are relevant to the applicant's eligibility for asylum." S. Rep. No. 104-249, at 21 (Apr. 10, 1996). The proposed bill thus contemplated a flexible approach and did not restrict the change in circumstances to those that take place before the applicant files an application. Months later, referring to the final Conference Report, Senator Hatch, then-Chairman of the Judiciary Committee, commented that the exception was intended to "ensur[e] that those with legitimate claims of asylum are not returned to persecution, particularly for technical deficiencies." 142 Cong. Rec. S11,840 (daily ed. Sept. 30, 1996) (statement of Sen. Hatch). "The changed circumstances provision," Senator Hatch reflected, "will deal with situations like those in which the situation in the alien's home country may have changed, the applicant obtains more information about likely retribution he or she might face if the applicant returned home, and other situations that we in Congress may not be able to anticipate at this time." Id.

21

In summary, we agree with Ordonez Azmen that § 1158(a)(2)(D) permits the agency to consider an asylum application that is otherwise untimely under § 1158(a)(2)(B) based on changed circumstances that occur after the application is filed. The BIA's conclusion to the contrary was error.

IV

We have already noted that the BIA's decision relied on 8 C.F.R. § 1208.4(a)(4)(ii), which requires that an otherwise untimely application for asylum that is excused by changed circumstances be filed "within a reasonable period given those changed circumstances." The BIA interpreted the phrase "given those changed circumstances" to mean that the changed circumstances "must occur before the related application is filed." C.A.R. 5. The Government asks us to defer to this interpretation. But the fact that the interpretation conflicts with the plain text of § 1158(a)(2)(D), as we have explained, is reason enough not to defer. Cf. Yan Yang, 939 F.3d at 61 ("[Where] there is no ambiguity in the statutory language, . . . there is no need for deference . . . under any of our existing models of deference to agency adjudication.").

When an agency's reading of its own regulation fails in this way, we are not required to save it by supplying an alternative reading that is consistent with

22

the statute. But in this case there happens to be a more coherent reading of 8 C.F.R. § 1208.4(a)(4)(ii). Where the regulation requires that an asylum application be filed "within a reasonable period given those changed circumstances," 8 C.F.R. § 1208.4(a)(4)(ii) (quotation marks omitted), we think that "given those changed circumstances" means "in light of" or "considering" the changed circumstances. See Given, American Heritage Dictionary (5th ed. 2011) (defining "given" in relevant part to mean "[g]ranted as a supposition; acknowledged or assumed," as in "[g]iven the condition of the engine, it is a wonder that it even starts"); cf. Yan Yang, 939 F.3d at 60 n.2 (paraphrasing the regulation to mean that "[t]he applicant must file [the] application within a 'reasonable period' in light of the changed circumstances"). Viewed in this basic light, the term "given" tells the agency that it must consider a pending application with changed circumstances in mind, regardless of when the change occurs.

We would withhold deference for the separate reason that the BIA lacks a settled position on the question. See Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019). Within only a few years of its decision in this case, the BIA issued an unpublished decision that reached the opposite conclusion, agreeing with us that

"neither the statute nor the regulation mandates that the changed circumstances must occur before the application is filed." In re J-R-F-F-, No. AXXX XXX 634, at 2 (B.I.A. July 9, 2019) (unpublished). A contrary ruling, the BIA explained, "would be arbitrary and random, as well as difficult to reconcile with the congressional intent" to "ensur[e] that those with legitimate claims of asylum are not returned to persecution, particularly for technical deficiencies." Id. (quoting 142 Cong. Rec. S11,840 (statement of Sen. Hatch)). And the BIA recently issued yet another unpublished opinion in which it reaffirmed that an applicant for asylum "may rely on changed circumstances that [materially] strengthen a claim" in a pending application without requiring the applicant to file a new application. In re A-R-A-, No. AXXX XXX 199, at 2 (B.I.A. Mar. 13, 2020) (unpublished). The BIA's conflicting interpretations of both 8 U.S.C. § 1158(a)(2)(D) and 8 C.F.R. § 1208.4(a)(4) over the years signals that its position in this case reflects neither its own "authoritative or official position" nor its "fair and considered judgment." Kisor, 139 S. Ct. at 2416–17 (quotation marks omitted); cf. Judulang v. Holder, 565 U.S. 42, 61–63 (2011).

The Government argues that we should nonetheless be swayed by In re T-M-H- & S-W-C-, 25 I. & N. Dec. 193 (B.I.A. 2010), a published decision on

24

which the BIA also relied to deny Ordonez Azmen's petition.[4]  But in <u>Azmen II</u> we described the relevant language in <u>T-M-H-</u> as dicta.  625 F. App'x at 563.  And more importantly, <u>T-M-H-</u> addressed an entirely different question.  There the BIA held that the regulation's reference to "a reasonable period" did not entitle asylum-seekers to an automatic extension of one year following a changed circumstance.  25 I. & N. Dec. at 193.  It said that "a reasonable period" should instead be determined "on a case-by-case basis . . . taking into account the totality of the circumstances."  <u>Id.</u>  But the asylum applications at issue in <u>T-M-H-</u> were filed approximately nine months or more after the alleged change in circumstances arose.  <u>Id.</u>  So the BIA had no occasion in that case to consider whether the changed circumstances must occur prior to the filing of an application or may be considered even if they occur while the application is pending before the agency.

---

[4] The BIA also relied on <u>In re M-A-F-</u>, 26 I. & N. Dec. 651 (B.I.A. 2015), which addressed the difference between an amendment to an existing application and a new application for asylum, to conclude that there may be an exception to its rule that changed circumstances must predate the filing of the application if the changed circumstances present "a new claim . . . completely untethered to an existing application."  C.A.R. 4 n.2.  The Government argues that this was merely "hypothetical" dicta.  Appellee's Br. 37–38.  Given our holding that changed circumstances need not predate the filing of an asylum application, we do not address whether the Government is right.

A central question before the BIA was whether Ordonez Azmen filed his application for asylum within a "reasonable period," considering the 2010 murder to which he pointed soon after it occurred.  See id.; 8 C.F.R. § 1208.4(a)(4)(ii).  If so, the BIA must then consider whether the changed circumstances Ordonez Azmen asserts "materially affect [his] eligibility for asylum."  8 U.S.C. § 1158(a)(2)(D).  We express no view on the answers to those questions.  We conclude only that under § 1158(a)(2)(D), changed circumstances that materially affect eligibility for asylum do not need to predate the filing of the asylum application in order to be considered by the agency.  The changed circumstances may first arise even while an otherwise untimely application is pending.

                                    CONCLUSION

We have considered the Government's remaining arguments and conclude that they are without merit.  Because the BIA rejected Ordonez Azmen's claims for asylum and statutory withholding of removal and his motion to remand based on an erroneous interpretation of 8 U.S.C. § 1158(a)(2)(D) and an inadequately explained analysis of Ordonez Azmen's proposed social group, we

26

**GRANT** the petition, **VACATE** the BIA's decision, and **REMAND** for further proceedings consistent with this opinion.